RICHMOND, FREDERICKSBURG & POTOMAC RAILROAD COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 68876. Promulgated January 9, 1936.

*E. Randolph Williams, Esq.,* and *Leland L. Miller, Esq.,* for the petitioner.
*E. C. Algire, Esq.,* for the respondent.

OPINION.

VAN FOSSAN: This proceeding was brought to redetermine a deficiency in the income tax of the petitioner for the year 1929 in the sum of $11,220.59.

Two questions are at issue:

(1) The deductibility as interest of certain payments on "guaranteed stock" secured by first mortgage.

(2) The proper amount of retirement loss on certain roadway and structures.

The petitioner was incorporated by an act of the General Assembly of Virginia on February 5, 1834.

During the year 1929, 7 percent guaranteed stock of the petitioner of the par value of $481,000 and 6 percent guaranteed stock of the par value of $19,300 were outstanding. Such stock had been issued under authority of the General Assembly of Virginia in accordance with certain resolutions of the petitioner's directors and stockholders. Two hundred thousand dollars of the 7 percent stock was issued under an act of the General Assembly of Virginia dated February 13, 1856, and pursuant to a resolution of the petitioner's stockholders passed on May 27, 1857. The pertinent paragraph of that resolution follows:

*Resolved,* That the said two thousand shares be and the same are hereby constituted a guaranteed stock, entitled, under any circumstances, to receive seven per cent. per annum, and that the President and Directors be, and they are hereby, instructed to pay semi-annual dividends on the said shares, on the first days of May and November of each year, of not less than three and a half per cent., any holder of the said guaranteed shares being privileged to receive any excess of semi-annual dividend beyond three and a half percent., which may be at any time paid on the common stock of the Company, without impairing the guaranty of seven per cent. per annum given by this resolution.

The resolution further authorized the execution of a mortgage or deed of trust "to protect the guaranty * * * by making the

principal of the whole guarantied (*sic*) stock created by the above resolutions, and seven per cent. dividend on the same, part of a first lien on all property, rights, privileges and franchises of the Company, and a debt of the Company immediately payable in the event of any default in the punctual payment of the dividends hereby guarantied." Of the remaining stock outstanding, 7 percent guaranteed stock to the amount of $127,100 and 6 percent guaranteed stock to the amount of $19,300 were issued under a similar act dated December 13, 1865, pursuant to resolution of the petitioner's stockholders of November 21, 1866, like in import to the resolution of May 27, 1857.

Seven percent guaranteed stock amounting to $131,200 was issued to replace 6 percent certificates of debt of the petitioner due July 1, 1869, under an act of February 13, 1856, and pursuant to resolutions of the stockholders dated November 18, 1868, while the remaining 7 percent guaranteed stock of the par value of $22,800 was issued under a similar act pursuant to a resolution of the stockholders of May 8, 1871, and a resolution of the board of directors passed on March 30, 1875. The latter resolution recites that the guaranteed stock was:

 * * * entitled under any circumstances to receive seven per centum per annum, free of all taxation, and that the Treasurer be and he is hereby instructed to pay semi-annual dividends on the said shares, on the first days of May and November of each year, of not less than three and a half per cent., any holder of the said Guaranteed Shares being privileged to receive any excess of semi-annual dividend beyond three and a half per cent., which may be at any time paid on the Common Stock of the Company, without impairing the guaranty of seven per cent. per annum, given by this resolution.

Each issue of the stock had individual certificates. The original certificates contained copies of the relevant resolutions. Later, the petitioner adopted new certificate forms on which appeared the words " secured by mortgage dated " (giving the appropriate date) and also a statement that the whole property, profits, and franchises of the petitioner were pledged for the payment of the dividends thereon. The certificates were transferable only on the books of the petitioner. All guaranteed stock carried full voting rights equal with the voting common stock of the petitioner.

After their issue both the 7 percent and 6 percent guaranteed stock were secured by two deeds of trust or mortgages dated May 21 and December 5, 1871. Both the dividends and principal of such stock were so secured. Upon foreclosure, the holders of the guaranteed stock and of certificates of debt and coupon bonds were to be paid from the proceeds, and the surplus, after payment of all debts and charges against the petitioner, was to be distributed among stockholders other than owners of guaranteed stock.

In two subsequent mortgages given to secure later bond issues, the petitioner recognized the priority of the liens securing the guaranteed stock, except as to specific stock issued in 1871.

During the year 1929 the petitioner paid to the holders of 7 percent guaranteed stock 7 percent on $481,000, or $33,677, and to holders of 6 percent guaranteed stock 6 percent on $19,300, or $1,158, a total of $34,835, which was paid and charged as in previous years to "Account 546, Interest on Funded Debt." The petitioner also paid to holders of guaranteed stock the sum of $25,213, the amount necessary to bring payment to the holders of guaranteed stock up to 12 percent, which percentage was paid to the holders of common stock and dividend obligations, and this was charged to "Account 614, Dividend Appropriation of Surplus." The petitioner claims as a deduction for interest paid the total of the above sums, $60,048. During the year 1929 the petitioner paid dividends on other than " guaranteed stock " in an amount of $1,480,128.

As of January 1, 1929, the accumulated net earnings of the petitioner as reflected in its " Profit and Loss " account amounted to $7,539,648.55. The total net earnings of the petitioner for the year 1929, as shown by its books of account, amounted to $2,565,305.02 before the payments on common stock, dividend obligations, and guaranteed stock other than the portion thereof which was charged to funded debt as aforesaid.

The guaranteed stock was carried on the petitioner's balance sheet as a long-term debt.

The Commissioners of Internal Revenue for succeeding years have allowed as an interest deduction in all years from 1918 to 1928, inclusive, the amount paid on the minimum guarantee, as well as the additional payment made to equalize payments made to common stock. In five proceedings before the Board, all settled without hearing, which cases involved the proper determination of the taxable income of this petitioner, no question was raised as to the propriety of the deduction of the amount of payments made on the guaranteed stock as interest and such deductions were allowed.

In its income tax return for the year 1929 the petitioner claimed a deduction of $189,907.60 as a loss on retired roadway and structures. This sum was arrived at by taking a total cost of $215,770.06 (composed of an estimated cost of $196,686.95 plus an actual ledger value of $19,083.11), adding thereto $5,099.62 as the cost of effecting retirement, and subtracting $30,962.08 as salvage value of retired assets. The estimated cost figures were taken from the basic inventory of the property made by the Interstate Commerce Commission as of June 30, 1916, as the best available evidence of the original cost.

The respondent disallowed the deduction to the extent of $32,553.20, on the following ground:

The reproduction cost new which was determined by the Interstate Commerce Commission and used by you as a basis for computing the deductible loss on retired road and structures is reduced 15% to arrive at a cost basis in 1904 and 1905, the years in which most of the retired property was acquired. This is done because the cost of new construction increased approximately 15% between 1904 and 1905 and the years used by the Interstate Commerce Commission as a basis for determining its values.

The respondent has conceded an allowance of $5,407.64 representing a deduction for current amortization of discount.

The first issue presents the question whether the amounts paid by the petitioner semi-annually on its "guaranteed stock" are in reality dividends or interest. The Board has held in many cases that the solution of such a problem depends on the facts in evidence in the case at bar, it being impossible to lay down a general rule of universal applicability. *Proctor Shop, Inc.*, 30 B. T. A. 721, and cases there cited. While the name given to an instrument will not be ignored, it is not conclusive. *I. Unterberg & Co.*, 2 B. T. A. 274. The weight to be given to any fact must be determined by consideration of its relative importance with respect to all other facts in proof.

The petitioner has been in existence over 100 years. The oldest issue of "stock" with which we are concerned was created in 1857. All certificates designated the security as "guaranteed stock." The original certificate forms contain the words: "For the payment on which of dividends * * * the whole property, profits and franchises of the company are pledged", and the underlying resolutions are printed thereon. On the later forms appears the phrase "secured by mortgage." Subsequent to the original issues mortgages were executed and recorded to secure the payment of the guaranteed stock and other types of indebtedness. The "stockholder" possessed voting rights and shared in the profits of the petitioner in excess of the guaranteed and secured return named on the face value of his certificate. Yet, upon the dissolution or liquidation of the corporation, he had no right to participate in the surplus. There was no definite time at which his money should be returned but there was a designated manner by which he could be assured of its payment in case the "dividends" were not paid as agreed. Thus, the security under consideration is unique in that it contains characteristics usually found in both certificates of indebtedness and certificates of stock.

It seems to us, however, that in this case the basic test to be applied is whether the stockholder invested his money with the view of receiving a return from its use dependent on the successful opera-

tion of the company, on the one hand, or, on the other hand, whether he invested with no regard to the profit or loss which the company might enjoy or sustain, but with a dependence on the regular payment of compensation for the use of the money and an assurance of its ultimate repayment. Though there are facts pointing to either interpretation, on a full study of the case we are convinced that the second characterization more aptly fits the situation and that the owner of the guaranteed stock should be classed as a creditor of the petitioner. True, he had the right to vote and was entitled to a share in the petitioner's net earnings after the payment of its current liabilities, including the so-called "dividends", but the primary consideration appears to have been the specified and certain income to the owner, coupled with an assured recovery of the principal by resort to the property if a default in the interest payment should occur.

Certainly, from the viewpoint of common creditors, the guaranteed stock must be considered as an indebtedness of the petitioner. Proper and adequate provision was made in the petitioner's charter for the creation of the security. Thus, the public was put on notice that such a debt would have priority over common debts. Deeds of trust or mortgages were executed and recorded in 1871 to provide lien security. Later mortgages specifically recognized the priority of the guaranteed stock as a lien debt. During the year 1929, therefore, no creditor could challenge successfully the prior right to the guaranteed stockholder as a creditor. By the authority of the Assembly of Virginia the petitioner was granted the right to secure the guaranteed stockholder in the payment of semi-annual interest and, under certain conditions, the principal in preference over all other creditors, preferred or common. Acting under that authority, the petitioner created the type of security called "guaranteed stock", secured it by mortgage or deed of trust, and gave ample notice to both stockholder and public that the interest thereon and principal were to be paid before all other debts and charges.

We conclude that the guaranteed stock constituted a debt of the petitioner and that the "dividends" of 7 percent and 6 percent paid thereon during the year 1929, aggregating $34,835, were in reality, interest. It follows that this was a deductible item.

As to the balance of the payments, aggregating $25,213, we are of the opinion it was correctly disallowed. This payment was a distribution of profits and differs essentially from the fixed payments. It was clearly a dividend. *Penn Mutual Life Insurance Co.*, 32 B. T. A. 839.

In the second issue the petitioner asserts that the respondent erroneously applied a 15 percent reduction in the allowance for the re-

tirement loss on roadway and structures. It also claims that the respondent erred as a matter of law in that he ignored as the best evidence of the original cost the estimated cost taken from the basic inventory of the petitioner's property, made by the Interstate Commerce Commission as of June 30, 1916.

From the facts it is obvious that the loss of $19,083.11, based on actual cost of physical assets installed since June 30, 1916, as disclosed by the petitioner's books, should be allowed, reduced by the amount of salvage values applicable thereto. Likewise, the cost of effecting the retirement of such assets should be allowed.

The remaining portion of the retired assets, whose " estimated cost " is $196,686.85, presents quite a different question. The petitioner contends that the finding of the Interstate Commerce Commission to the effect that for rate-making purposes the assets in question had a certain value as of June 30, 1916, based on their estimated costs, should be accepted by this Board as proper evidence of the actual cost of structures and roadway constructed in 1904, 1905, and 1906. The petitioner cites *Finance Docket 3839*, 170 I. C. C. 467, and *Texas Midland Railroad*, 75 I. C. C. 1 (p. 140).

The respondent accepted as a measure of cost the amount fixed by the Interstate Commerce Commission as the estimated cost as of June 30, 1916, but made an arbitrary reduction of 15 percent on the theory that the cost of construction increased approximately 15 percent between 1904 and 1905 and the years used by the Interstate Commerce Commission as the basis for determining values. We do not know by what means the respondent arrived at the 15 percent differential in cost but neither has it been shown that the rate is erroneous. The burden is on the petitioner so to prove.

The explanation made by the Interstate Commerce Commission of its determination of value is couched in the most general terms. The duty of the Commission was to find *some* definite value for rate-making purposes. The condition of the books of railroad companies and their methods of bookkeeping were such that, in many cases, it was impossible to arrive at any accurate cost figures. Such a condition existed with respect to the petitioner's records. Consequently, the Commission struck a fair average of replacement costs " at normal prices as of 1914 " and adopted a general rule that such estimated costs approximated the original cost of construction. In other words, the Commission did the best it could with the data at hand.

The petitioner has produced no evidence to show that the cost of constructing the roadway and structures retired had not advanced 15 percent during the period from 1904 to the basic years used in arriving at the Commission's estimated cost figures. If the respondent was in error in using such rate the petitioner should have proved that fact.

We note, however, that the respondent has erred in applying his own ratio of 15 percent to the assets having an estimated cost of $215,770.06. He used that ratio "because the cost of new construction increased approximately 15 percent." Hence, the base of the 15 percent increase is the estimated cost in 1904 and not the appreciated cost as of 1916. The correct amount of retirement "loss" is $\frac{109}{113}$ of $196,686.95, less the proportionate amounts of salvage values applicable to the items to which no ledger value was assigned. The cost of effecting retirement, $5,099.62, is a proper deduction as a loss.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

MURDOCK dissents.

McMAHON, dissenting: In my opinion the payments in question in this proceeding were in truth "dividends", correctly denominated as such, and not interest. See the discussion in the second dissenting opinion, and the citations therein set forth, in *Great Southern Life Insurance Co.*, 33 B. T. A. 512. Hence, the deduction of such payments from income should not be allowed.