Hemenway-Johnson Furniture Co., Inc. v. Commissioner.
Hemenway-Johnson Furniture Co. v. Commissioner
Docket No. 13648.
United States Tax Court
1948 Tax Ct. Memo LEXIS 158; 7 T.C.M. (CCH) 380; T.C.M. (RIA) 48113; June 23, 1948
Laurence F. Casey, Esq., 31 Nassau St., New York, N. Y., for the petitioner. Francis S. Gettle, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies for the fiscal years ended March 31st, as follows: Declared Value
Excess Profits Tax
Excess-
Year
Income Tax
Profits Tax
Deficiency
Penalty
1941
$10,042.73
$5,060.36
$ 1,119.08
$279.77
1942
8,928.62
2,236.09
11,293.86
1943
1,772.35
1,369.34
38,825.57
The petitioner paid the excess profits tax deficiency and the addition to the tax for 1941 *159 on May 15, 1946, and claims an overpayment thereof. The respondent claims, in his amended answer, increased deficiencies for 1943 of $2,971.51 in income tax, $657.42 in declared value excess-profits tax, and $1,687.26 in excess profits tax. The issues for decision are whether the Commissioner erred in disallowing deductions claimed for 1941, 1942 and 1943 as interest on so-called debenture bonds and notes, and also, parts of deductions claimed for 1942 and 1943 as reasonable compensation paid to an officer. The addition to the tax for 1941 was imposed for failure to file an excess profits tax return, as to which the sole issue is whether the petitioner was required to file such return. At the hearing the petitioner accepted the respondent's determination that expenditures made for a gallery and removable partitions, which were claimed as deductions for 1941, were a capital outlay. On brief the respondent concedes that the cost thereof should be depreciated over the remaining life of the petitioner's lease (eight years and three months.) Findings of Fact The parties have filed a stipulation of facts which is incorporated herein by reference. Some of the stipulated facts are *160 also recited hereinafter, together with our findings of fact based upon the testimony adduced at the hearing of this proceeding. The petitioner, a corporation, was originally named Hemenway, Inc. It was organized in 1931 under the laws of Louisiana for the purpose of engaging in the business of wholesaling and retailing furniture and household appliances. The petitioner now operates nine retail furniture stores and a wholesale appliance business. There is also a subsidiary finance company. The petitioner's accounts are kept on an accrual basis. All of its tax returns for the fiscal years here involved were filed with the collector of internal revenue at New Orleans, except that no excess profits tax return was filed for the year ended March 31, 1941. Frank Hemenway, Jr., has been president of the petitioner throughout its existence. He organized the petitioner to take over certain inventory and other assets of the Hemenway Furniture Co., Ltd., in which his father had been the principal stockholder. The petitioner began business at a store in Alexandria, Louisiana, and during its first year its sales were approximately $150,000. In September 1932 it opened a small store on Milam *161 Street in Shreveport. The annual sales of this store were nearly $200,000 when it was moved in 1935 to a better location on Texas Street. During the first year at this location the petitioner's Shreveport business was approximately doubled. Thereafter it was the principal competitor of Shreveport's leading furniture store which was then operated by the Johnson Furniture Co. In 1937 Hemenway moved his residence from Alexandria to Shreveport. In the meanwhile the petitioner opened several branch stores. In 1938 the petitioner and the Johnson Co. engaged in extravagant promotional activities and waged a price war which resulted in a reduction of net earnings. At about the same time the petitioner was notified that it would have to pay an increase of about 400 per cent in rent for the renewal of its lease. It could not find another location in Shreveport. At this point it occurred to Hemenway that he could solve the dual problem of competition and location if he could buy out the Johnson Co. In January 1939 Hemenway approached J. R. C. Moseley, who was the vice-president, general manager and majority stockholder of the Johnson Co., to find out whether the business of that company was *162 for sale. Both Moseley and F. M. Johnson, the other principal stockholder, wanted to retire from the business of the Johnson Co. After numerous preliminary discussions Moseley reported that his company would sell its accounts receivable, inventories and certain other fixed assets at face value, for cash, and that the company would lease its building to the petitioner. On that basis the petitioner would have had to pay about $584,000 in cash which it did not have and could not raise. It was agreed later that the petitioner would be given time to pay $250,000 of the total price. Even on those terms Hemenway was advised by the president of his bank in Alexandria that the petitioner's credit was too far extended to enable it to sell enough debentures to raise the required amount of cash from the public. The bank agreed, however, that it would make a demand loan of over $300,000 if the Johnson Co. would agree to take $250,000 of the purchase price in preferred stock and if the petitioner could sell an additional $100,000 worth of preferred stock. The bank refused to make the loan if the petitioner issued debentures. Moseley objected to this proposal but finally agreed to take preferred *163 stock when Hemenway assured him that the deal could not be financed in any other way, and further assured him that the petitioner would give the Johnson Co. some notes to replace the preferred stock or refinance the transaction in some other satisfactory way if, as and when possible. Moseley and Johnson wanted either cash or notes, rather than preferred stock, but Hemenway's assurances had weight in closing the agreement. In the meanwhile, Hemenway prevailed upon P. H. Corbett, who held petitioner's note for $50,000, to agree that he would surrender this note and pay another $50,000 in cash for $100,000 of petitioner's preferred stock, provided that he would also receive 1,500 shares of its common stock which then had a value of $15,000. On or about June 3, 1939, the petitioner purchased all of the assets of the Johnson Co., except its real property, at a total cost of $584,115.76. On that date the petitioner adopted its present name and its charter was also amended to provide for an authorized capital [1] of 4,200 shares of 8 per cent cumulative preferred stock, each having a par value of $100 per share, as well as 50,000 shares of voting common stock and 30,000 shares of nonvoting *164 common stock, both without par value. There were 684 shares of preferred stock then outstanding. On June 5, 1939, the petitioner borrowed $334,115.76 from its bank, with the understanding that not less than $200,000 would be repaid by the liquidation of inventories and accounts receivable before January 1, 1940. The petitioner then paid over the proceeds of this loan and issued 2,500 shares of its preferred stock to the Johnson Co. It also issued 1,000 shares of its preferred stock to Corbett. Moseley asked for, and received, the privilege of having the preferred stockholders elect three out of the petitioner's seven directors, and in case of default in dividend payments, the right to elect four of the directors. The record does not show the manner in which this privilege was given. He wanted a voice in the management solely in order to protect the interest of the Johnson Co., in keeping the petitioner's assets from being dissipated in dividends or salaries or bonuses. Shortly after the sale, Moseley, Johnson and Corbett became directors of the petitioner. Moseley and Corbett regularly attended the meetings of, and voted on all questions before, the board of directors; but otherwise *165 the operation of the business was left in the hands of Hemenway. Moseley remained a director until 1945. The bank loan of $334,115.76 was reduced by the petitioner at various times until it was fully paid on January 5, 1940, with interest at the rate of 7 per cent. Other loans with the same bank were then repaid with the proceeds of a loan of $150,000 which the petitioner secured from Corbett. Because of his feeling of obligation to Moseley and Johnson by reason of the assurances he had given them, and because he wished, for tax purposes, to replace the preferred stock with true interest-paying obligations, Hemenway wanted to issue debentures in exchange for the petitioner's outstanding preferred stock, but did not want to do so while the bank was in a position to object. When all of the bank loans were paid off Hemenway proposed a plan for the issuance of debentures. Hemenway wished the due date to be 1970, while Moseley and Johnson wished the debentures *166 to be for a shorter term. Finally, Moseley and Johnson agreed to the term proposed by Hemenway, provided that they would not lose any rights which they already had under the preferred stock. As of March 27, 1940, the petitioner's preferred stock was held as follows: August W. Berdon
100 shares
F. S. Hemenway, Sr.
350 shares
Louise J. Hemenway
52 shares
Murdock McIntosh
40 shares
Alfred Wettermark
142 shares
Johnson Furniture Co.
2,500 shares
P. H. Corbett
1,000 shares
Total
4,184 shares Louise J. Hemenway, McIntosh, Wettermark and Corbett were among 15 persons who held voting common stock of the petitioner during the taxable years. On March 27, 1940, the petitioner's charter was amended to authorize its board of directors to issue debentures, not to exceed the sum of $420,000, in multiples of $100. The amendment provided that the debentures were to be issued on April 1, 1940, to be due and payable thirty years thereafter unless sooner called and paid, with interest at the rate of 8 per cent which was cumulative and payable before any dividend, liquidating or otherwise, could be paid on the common stock. The debentures were subordinated to the petitioner's *167 other debts. If the petitioner called and paid less than the full face amount of all of the debentures, then it had to call and pay the same proportionate amount of all debentures. The amendment further provided that all general voting power would be held by the voting common stockholders, except that three of the petitioner's seven directors were to be elected by the holders of the debentures. If the petitioner failed to pay two semiannual interest payments on the debentures a cause of action should arise to collect such pastdue interest, and also, in that event, all voting power was to pass to the holders of the debentures, except that three of the seven directors then were to be elected by the voting common stockholders until the petitioner had sufficient earnings to pay all interest in default, any deficit which might have existed and two other consecutive semiannual interest payments on the debentures. Upon thirty days' notice a majority of the holders of the debentures could require the petitioner to exchange their debentures for voting common stock at book value, but the petitioner was required to issue only so many shares in exchange for debentures that, after the exchange *168 was completed, the proportion of the newly issued shares was not greater than 45 per cent of the total number of shares of voting common stock. The number of shares which could be exchanged for debentures was to be fixed as of the time of the first election; the remaining debentures could, however, be exchanged later for nonvoting common stock at book value, or for one-year notes with interest at 4 per cent as determined by the petitioner. It was further provided that until such time as the debentures were called, and paid, exchanged or otherwise retired, the dividends declared and paid on common stock in any one year could not exceed 5 per cent of the book value thereof nor 25 per cent of the petitioner's net earnings for that year, but in computing net earnings the interest on debentures was to be included as expense. This restriction was not to be defeated by the payment of unreasonable salaries or bonuses but it could be waived by unanimous vote of the directors. However, a common stockholder who had exchanged his debentures for less than 25 per cent of the voting common stock could prevent such action on the part of the directors, but if he persisted the petitioner had the right *169 to call and pay for his stock at book value. The board of directors was authorized to issue additional debentures upon the affirmation vote of two-thirds of the voting common stock, and two-thirds of the holders of the outstanding debentures. On or about March 31, 1940, pursuant to the amendments hereinbefore described, the petitioner issued debentures in exchange for its outstanding preferred stock. On April 1, 1940, additional debentures were issued for cash to F. S. Hemenway, Sr. ( $600), and Louise J. Hemenway ($1,000). During the fiscal years ended March 31, the debentures were held as follows: 1943
1941
1942
(up to 12-31-42)
August W. Berdon
$ 10,000
$ 10,000
$ 10,000
Perry H. Corbett
100,000
100,000
109,700
Louise J. Hemenway
6,200
6,200
6,200
Est. of Frank Hemenway Sr., Frank Hemenway Jr., Trustee
35,600
35,600
35,600
Johnson Furn. Co.
250,000
250,000
250,000
Murdock McIntosh
4,000
4,000
4,000
Alfred Wettermark
14,200
Frank Hemenway, Jr.
5,200
Paul Hemenway
4,500
Eliz. Hemenway Foote
4,500
4,500 On August 29, 1942, Frank Hemenway, Jr., and Paul Hemenway sold to Perry H. Corbett the debentures held by *170 them as of the close of the fiscal year ended March 31, 1942. The petitioner's debentures were issued in the following form: "No. 43 $100.00 "United States of AmericaState of Louisiana Parish of Rapides "For Value Received, Hemenway-Johnson Furniture Co., Inc., hereinafter called Company, promises to pay to the recorded holder hereof, on or before the 1st day of April, 1970, the sum of ONE HUNDRED DOLLARS ($100.00), together with interest thereon at the rate of 8% per annum, payable semi-annually on the first days of October and April of each calendar year, beginning with October 1, 1940. "The Company Reserves the right to pay this indebtedness at any time upon giving five (5) days' written notice to the recorded holder hereof, its right to call this debenture being in accordance with the terms of the Company's charter. "This is one of a series of debentures of like tenor of which the aggregate amount outstanding does not exceed the sum of $420,000.00. This debenture and the others of said series are deferred in rank to the other debts of the Company and the holders of said debentures shall not be entitled to payment unless there are sufficient assets on hand to pay *171 the other debts of the Company. In the event of a liquidation of the Company's affairs the holders of these debentures shall not be paid until all other creditors shall have been paid in full. "This Debenture shall be recorded in the name of the holder on the books of the Company and shall be transferred on the order of the recorded owner. All payments of principal or interest shall be made to the person in whose name this debenture is recorded on the books of the Company. "This Debenture is issued subject to the provisions of the Company's charter, all of which, by reference, are made a part of this debenture. "In Witness Whereof, Hemenway-Johnson Furniture Co., Inc., has signed these presents and has affixed its corporate seal on this the day of , A.D. 19 . "Hemenway-Johnson Furniture Co. Inc.
"By President "ATTEST: Secretary." The petitioner accrued on its books and paid in cash to the holders of its debentures, the sum of $33,600 during each of the fiscal years 1941 and 1942, and $26,143.33 during 1943. Those amounts were deducted as interest in the petitioner's tax returns for the respective years involved. By December 28, 1942, the petitioner had accumulated *172 substantial amounts of cash because it was unable to secure merchandise in the usual quantities, its collections had increased and its cash sales had also increased in proportion to instalment sales. It had enough cash to redeem the debentures held by the Johnson Co. but it did not have enough cash to redeem all of its outstanding debentures. On or about December 31, 1942, the petitioner borrowed $200,000 from Corbett for which it gave a promissory note due April 1, 1970, with interest at 8 per cent. On the same date it redeemed $369,700 of its outstanding debentures and on January 10, 1943, it redeemed the balance of $50,300. On the latter date the petitioner borrowed $49,100 for which it gave promissory notes due April 1, 1970, with interest at 8 per cent, to Frank Hemenway, Jr., Trustee ($35,600), Elizabeth Hemenway Foote ($4,500), Louise J. Hemenway ($5,000), and Murdock McIntosh ($4,000). By the redemption of its debentures and the issuance of its promissory notes the petitioner's deferred liabilities were reduced from $420,000 to $249,100, or a reduction of $170,900. The notes, including the note given to Corbett, were in the following form: No. $ "UNITED STATES OF AMERICA *173 STATE OF LOUISIANA PARISH OF RAPIDES
"For Value Received, HEMENWAY JOHNSON FURNITURE CO., INC. hereinafter called Company, promises to pay or the recorded holder hereof, on or before the 1st day of April, 1970, the sum of Dollars, together with interest thereon at the rate of % per annum, payable semi-annually on the first days of October and April of each calendar year, beginning with the date hereof. "The Company reserves the right to pay this indebtedness or any portion thereof, at any time upon giving five (5) days written notice to the recorded holder hereof. "This note is deferred in rank to the other debts of the Company and the holder of this note shall not be entitled to payment unless there are sufficient assets on hand to pay the other debts of the Company. In the event of a liquidation of the Company's affairs the holder of this note shall not be paid until all other creditors shall have been paid in full. "This note shall be recorded in the name of the holder on the books of the Company and shall be transferred on the order of the recorded owner. All payments of principal or interest shall be made to the person in whose name this note is recorded on the books of *174 the Company. "IN WITNESS WHEREOF, Hemenway-Johnson Furniture Co., Inc., has signed these presents and has affixed its corporate seal on this the day of 19 . "HEMENWAY JOHNSON FURNITURE CO., INC.
"By "ATTEST: Secretary" During the period January 10, 1943, to March 31, 1943, the petitioner paid $9,960.92 to the noteholders named hereinbefore. It deducted that amount as interest in its tax return for the fiscal year. The petitioner's net sales for the fiscal years 1937 through 1943, ended March 31, of each year, were as follows: Net Sales
1937
$ 715,183.17
1938
692,354.35
1939
611,271.37
1940
1,443,616.40
1941
1,756,826.31
1942
1,997,517.38
1943
1,385,092.23
The petitioner paid dividends on its preferred stock during the fiscal years 1937 through 1940, and on its common stock during the fiscal years 1937 and 1939 through 1943. During those years officers' salaries and bonuses were paid by the petitioner and deducted on its tax returns as follows: Frank Hemenway, Jr.,
Paul Hemenway,
President
Vice-President
Others
Year
Salary
Bonus
Salary
Bonus
Salary
Bonus
1937
$ 7,500
$10,000
$ 5,000
$ 2,400.00
$10,000
1938
7,500
6,000
$ 3,202.00
2,000
3,000.00
6,000
1939
7,500
4,000
3,901.00
3,000.00
2,000
1940
11,375
10,000
4,500.00
8,000.00
1941
12,000
5,625.00
8,250.00
1942
11,300
15,000
7,708.32
5,000
11,499.92
1,000
1943
3,600
15,000
11,699.85
15,000
10,199.94
2,000
*175 From 1934 until about February 19, 1942, Frank Hemenway, Jr., had the entire responsibility for the management and financing of the petitioner's business. He set up systems of accounting and bookkeeping, inventory controls and collection methods. He personally attended all markets, did the larger part of the buying and wrote all of the advertising prior to June 1939. He negotiated all leases and contracts, and arranged for all loans and financing. He worked long hours, frequently in the evening and often on Sundays. He had the reputation of being a highly capable furniture executive. He had the task of closing out the old store in Shreveport, liquidating inventories, bringing together the personnel of the two businesses and reorganizing the petitioner's new store. During the year ended March 31, 1941, Hemenway was not paid any bonus because the petitioner had no cash available, its credit was extended and it had trouble meeting its obligations. However, the board of directors adopted the following resolution on February 14, 1941: "On motion made by J. R. C. Moseley and seconded by F. M. Johnson, a resolution was unanimously adopted declaring that it was the sense of the Board *176 of Directors that the management of the corporation had done an unusually good job during the current fiscal year and that under normal circumstances, based on the profits earned, the management should be given extra remuneration in the form of an annual bonus, but that since the business is in an expanding condition necessitating the use of large amounts of borrowed money, it was deemed unwise at this time to withdraw cash for this purpose, or set up additional obligations. It was, however, resolved that this Board of Directors, or its successors, should feel and assume a moral obligation to consider the interest of the management and its work and success during the current fiscal year at a future date when, in its judgment, the bonus could be paid without jeopardizing the interest of the stockholders and/or bond holders." On February 19, 1942, Frank Hemenway, Jr., was commissioned as an officer in the U.S. Navy. He was ordered to active duty within a few days thereafter and was stationed at New Orleans until May or June 1942. He kept in close touch with the petitioner's business. He visited Alexandria and Shreveport once or twice and his brother, the petitioner's vice-president, *177 visited him at New Orleans. They telephoned and corresponded with each other regularly. When Frank was later transferred to Chicago his brother visited him there. In October 1942 he was ordered to the U.S.S. Card, a small carrier, then fitting out at Tacoma, Washington. He was aboard the Card when it departed for the East Coast via the Panama Canal about January 1, 1943. The Card did not enter into North Atlantic service until after March 31, 1943. Hemenway received detailed monthly reports and corresponded with the petitioner's officers throughout his naval service. He was released from active duty in October or November 1945, and thereupon resumed his duties with the petitioner. Before Hemenway entered the Navy he discussed his salary with the petitioner's board of directors. They knew of the issuance of an Income Tax Unit Ruling (I.T. 3417) which provided that salaries paid to employees who were absent in military or naval service but who intended to return to their employment at the conclusion of the emergency constituted allowable deductions from gross income for Federal income and excess profits tax purposes. They decided, however, to reduce Hemenway's basic salary to $3,600 *178 because they did not know what the petitioner would be able to pay. On December 15, 1942, the payment of a bonus was discussed by the directors. They took into consideration the services Hemenway had actually rendered in the past, for which he had not been compensated, as well as those rendered during the fiscal year 1943 to the extent hereinabove described. They authorized the payment of a bonus of $15,000. On March 8, 1945, the Bureau of Internal Revenue published a special ruling which held, in substance, as follows: "Salaries to employees absent in armed forces or in government service during present emergency. - The Bureau has reconsidered its position taken in a letter dated November 29, 1944, 443 CCH paragraph 6688, 454 CCH paragraph 6057. Upon reconsideration of the letter, and in view of the rule stated in I.T. 3417, 1940-2 CB 64, it is now held by the Bureau that salary payments to employees who are absent in the armed forces, or who are serving the government in other ways at a nominal compensation, are deductible expenses if the payments are reasonable in amount, even though the employer has not adopted the policy of making such payments to its employees *179 generally. It is stated that it was not intended that I.T. 3417 should preclude inquiry into the facts in each particular case, and in any case where the payments seem to be unreasonable, or are motivated by the employee's proprietary interest in the business or by his family relationship, the deductions will be disallowed." Frank Hemenway, Jr., owned 21.86 per cent of the petitioner's outstanding voting common stock during the fiscal year 1941 and 25.89 per cent of such stock during each of the fiscal years 1942 and 1943. He did not own any of the petitioner's preferred stock. He held $5,200 of its debentures for a short time as shown hereinbefore. Reasonable compensation for the services actually rendered by Frank Hemenway, Jr., is not less than the amounts paid by the petitioner and deducted on its tax returns for the fiscal years 1942 and 1943. Opinion KERN, Judge: The first question presented for decision is whether the payments made by the petitioner on its debentures during each of the taxable years are deductible as interest under section 23 (b) of the Internal Revenue Code. The statute provides for the deduction of "interest paid or accrued within *180 the taxable year on indebtedness." The question therefore, depends upon whether an indebtedness of petitioner actually existed which was evidenced by the debentures issued by it on April 1, 1940. The debentures in question were issued in exchange for the petitioner's preferred stock. The debentures contained a promise to pay a certain annual amount as "interest" regardless of the amount of the corporation's earnings; they were assignable without restriction; and they had a definite maturity date in the reasonable future. In short, although subordinated to other debts, they had most of the principal characteristics of an indebtedness. See John Kelley Co., 326 U.S. 521; Commissioner v. H. P. Hood & Sons, Inc., 141 Fed (2d) 467. But for one clause contained in the debentures, the present controversy probably would not have arisen. That clause provided that the petitioner's charter was made a part of the debentures, by reference; and the charter gave the holders of the debentures, in addition to new rights under the debentures, certain of the rights which they had had previously held as preferred stockholders. These included the cumulative right to the annual *181 payments and priority over the petitioner's common stock; and these rights were reinforced by certain limited voting privileges. The debenture holders could elect three directors out of seven, and in case of default in the annual payments of "interest" they could elect four of the directors. They had the additional right to exchange the debentures for common stock under certain conditions and within certain limits. However, the fact that these were convertible debentures is not greatly stressed in argument, and, in our opinion, is immaterial. The respondent contends that due to these charter provisions the debentures represented proprierity rights rather than an indebtedness. He also relies upon the circumstances underlying the issuance of the debentures. The real problem in this proceeding is to determine from all the facts and circumstances whether the parties intended the transaction to give rise to an indebtedness or to constitute the debenture holders proprietors of the business and assets of the corporation subject to the risks of the business. While the debentures were issued in exchange for preferred stock, most of that stock was issued as part payment for assets which *182 the petitioner acquired from its principal competitor, the Johnson Co. That company did not want to be paid in preferred stock but finally agreed to accept the stock upon being assured by the petitioner's president that the deal could not be financed in any other way, and that the stock would be redeemed or exchanged, if, as and when possible. The petitioner's president wanted to secure the tax advantage of interest deductions, according to his testimony, but that advantage was not the main purpose served by the issuance of the petitioner's debentures. He also wanted to fulfill his obligation to the officers and stockholders of the Johnson Co. The entire transaction was at arm's length with both parties negotiating for their own advantage. The evidence has satisfied us that the Johnson Co. did not want to become an investor and that it accepted preferred stock in 1939 only because of the assurance hereinbefore mentioned. It wanted the purchase price of the assets to be paid by petitioner either in cash or in definite obligations of petitioner. On the other hand, the evidence is that, by force of the circumstances related in our findings, the Johnson Co. consented to become a temporary *183 investor with the assurance and reasonable expectation that the stock would be redeemed in cash, or exchanged for some definite obligation of petitioner within the near future. There was, at least, a moral obligation on the part of the petitioner to redeem the stock or to issue the debentures in question. The petitioner recognized that obligation by issuing the debentures within 9 months, and by redeeming them within 3 1/2 years, after the original transaction. Cf. Palmer, Stacy-Merrill, Inc., 37 B.T.A. 530, aff'd on reconsideration, 39 B.T.A. 636, aff'd 111 Fed. (2d) 809, in which the sellers of certain assets accepted stock only on condition that the stock would be redeemed in cash and the dividends paid on dates certain. The difference between that case and the present one is slight. The Johnson Co. secured certain voting rights when it received the petitioner's preferred stock. The record does not show how this privilege was obtained. This privilege, however, was plainly intended to give the Johnson Co. an advantage in collecting the full face amount of the preferred stock. The primary purpose of obtaining this right was not to establish *184 a proprietary interest as such, but to serve as additional security. The Johnson Co. originally had wanted to be paid in cash; later it agreed to extend credit for part of the payment; finally, it accepted preferred stock with the reservation that it would have a voice in the management for the sole purpose of protecting and securing its right to the payment of the balance of the purchase price of its assets represented by the amount of the preferred stock which it received. When the debentures were issued by the petitioner, however, the Johnson Co. was permitted to keep certain of its voting rights in return for its consent that the debentures should be for a longer term than it had thought desirable. In the light of all the circumstances underlying the issuance of the debentures, we have concluded that the voting, or the proprietary rights were not intended to be the primary characteristics of the transaction, but rather were in the nature of additional security, and they did not so detract from the other characteristics of the debentures as an indebtedness as to cause us to conclude that the debenture holders were proprietors rather than creditors of petitioner. Cf. Richmond, Fredericksburg & Potomac Railroad Co., 33 B.T.A. 895, 898, *185 aff'd 90 Fed. (2d) 971. See Industrial Addition Assn., 1 T.C. 378, 385. Upon all of the facts and circumstances presented by the record, we conclude that the parties to the transaction intended to create, and actually created, an indebtedness of petitioner on April 1, 1940. It follows that the Commissioner erred in disallowing as interest the payments made on the debentures during each of the taxable years. The next question is whether the payments made by the petitioner on its promissory notes are deductible under section 23 (b). These notes did not incorporate any of the charter provisions hereinbefore mentioned, but they carried the same maturity date as the debentures. They, too, created an indebtedness of the petitioner. Accordingly, we hold that the Commissioner erred in disallowing an interest the payments made on the notes during 1943. In reaching our conclusion upon these two issues, we have not ignored the cases cited by respondent in his brief. It is a truism that each case involving the question here presented must be decided on its peculiar facts. We consider that the facts of the instant case distinguish it from those cited by respondent. *186 The next question is whether the Commissioner erred in disallowing parts of the deductions taken by the petitioner for payments of salary to its president during the taxable years 1942 and 1943. The Commissioner determined that reasonable compensation for the petitioner's president and largest stockholder, who entered the Navy on February 19, 1942, is not in excess of $24,108.33 for the fiscal year ended March 31, 1942, and not in excess of $3,600 for the fiscal year 1943. The effect of that determination is to disallow 1/12th of the compensation paid during the fiscal year 1942 and all of the bonus paid during the fiscal year 1943. The evidence is that the petitioner's president had rendered valuable services in the past for which he was not fully compensated; that his basic salary was greatly reduced when he entered the Navy; and that the compensation paid to him during the fiscal years 1942 and 1943 was in recognition of past services as well as those actually rendered during the taxable years. Hemenway, the president, was the largest stockholder but he did not own a controlling interest in the petitioner. Moreover, the Johnson Co. was in a position to keep the salaries paid *187 by the petitioner at a reasonable level. And finally, the petitioner had an employer's interest in retaining Hemenway's services as an experienced and highly competent furniture executive upon his release from the Navy. Cf. Berkshire Oil Co., 9 T.C. 903. On all the evidence we think the petitioner has demonstrated that the amounts paid to its president during the years in question were reasonable in amount. We hold that the Commissioner erred in his determinations for both years. The final question is whether the addition to the excess profits tax for the fiscal year 1941 was properly imposed under section 291 of the Internal Revenue Code. That section provides relief from delinquency penalties where the failure to file a required return is "due to reasonable cause and not due to willful neglect." The petitioner has not offered any evidence to show that its failure to file an excess profits tax return for 1941 was due to reasonable cause. Whether it was required to file such return, however, will depend upon the results of the computation under Rule 50 in accordance with the stipulation of the parties and our opinion herein. If any excess profits *188 tax was due in accordance therewith, an addition to such tax would be properly imposed. Decision will be entered under Rule 50. Footnotes
1. Petitioner began business in 1931 with paidin capital of $120,000 represented by 1,000 shares of 8 per cent cumulative preferred stock, each having a par value of $100 per share, and 2,000 shares of no par value common stock.↩