The Davidson Building Company, a Corporation v. Commissioner.
Davidson Bldg. Co. v. Commissioner
Docket No. 78475.
United States Tax Court
T.C. Memo 1961-247; 1961 Tax Ct. Memo LEXIS 97; 20 T.C.M. (CCH) 1291; T.C.M. (RIA) 61247; August 31, 1961
Elmer J. Babin, Esq., Carnegie Hall, Cleveland, Ohio, for the petitioner. Vernon R. Balmes, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in petitioner's income tax for the taxable years 1954, 1955, and 1956, in the respective amounts of $9,514.58, $6,742.40, $7,188.22. The issues are (1) whether respondent correctly disallowed a portion of the deductions for depreciation for the taxable years 1954, 1955, and 1956, and (2) whether petitioner is entitled to deduct as business expense amounts attributable to discount on debentures determined by respondent to be contributions to capital rather than indebtedness. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner is a corporation organized and existing under the laws *98 of the State of Iowa. Petitioner maintains its principal office at 910 Carnegie Hall, Cleveland, Ohio. Federal income tax returns for the taxable years 1954, 1955, and 1956 were filed by petitioner, on an accrual method of accounting, with the district director of internal revenue, Cleveland, Ohio. Petitioner was organized to acquire the real estate and building described as "Lots Six (6), Seven (7), and Eight (8), Block Three (3), Sioux City," hereinafter called the building. The building was built on the northeast corner lot of Sixth Street and Pierce Street, running 150 feet north on Sixth and 150 feet east on Pierce, in 1914. It is an L-shaped building, with a small parking lot in the rear. It houses numerous stores on the ground floor, including one of the most popular drug stores in town, while the upper floors have offices primarily occupied by attorneys, accountants and doctors. The building is located in the center of the financial and business district of Sioux City. It is two blocks north of the best retail area and is near the City Hall, the County Court House, and many banks. The building is run-down and obsolete in many respects. There are two manual elevators *99 that are old but in good running condition. It has been 20 years since their last remodelling and they are run by direct current which eventually must be changed to alternating. There is no freight elevator. The building tips slightly so that it is periodically necessary to adjust the guide lines of the elevators. The ceilings in the building are 10 to 15 percent higher than more modern buildings and the windows are double-hung, large, and antique in style, with the result that the building is difficult to air-condition. In addition, there is insufficient power capacity and sewerage to air-condition more than the present 30 percent of the building. Many of the design and construction features of the building are similarly outdated. The foregoing conditions have affected the vacancy rate of the building. Despite the reasonably good physical condition, the antique features have led to a present vacancy rate of 10 percent as compared to less than 1 percent prior to 1954. It would be uneconomic to erect a new office building or to use the land for a parking lot. A 1-story building would be the best possible use for the land in the present market. In 1954, the assessed valuation for *100 tax purposes was $68,725 for the land and $149,000 for the building. This assessment was made in 1941 and there have been many changes since. The movement of business and the expansion of the community have caused the tax assessments to be irregular. The Davidson plot has increased in value 25 percent from 1941 to 1954. The economic value of buildings in this area, as opposed to the physical value, has generally decreased, while building construction costs have increased over 200 percent during this same period. In 1954, the cost of constructing a building duplicating the Davidson Building would have been $1,778,094. On February 1, 1954, $820,000 of fire insurance at 80 percent co-insurance was carried on the Davidson Building. This coverage was increased to $1,215,000 in 1956 to cover 100 percent of the insurable replacement cost. Improvements made to the building in general and for various tenants prior to February 1, 1954, were as follows: Feb. 1, 1954
Depreciated
Lease improvements:
Cost
Balance
Toller's Drug Store
(Store front, exterior of building, lobby)
$ 5,444.08
$ 4,840.91
Room 305-18
(Partitions and wiring. Lease expires 5/31/57.)
2,434.56
1,899.97
Room 319-26
(Partitions and wiring. Lease expires 5/31/57.)
5,321.38
4,152.92
Air conditioner, S & D
1,190.00
984.48
Building improvements - 1953
2,030.00
1,853.50
Elevator and equipment
5,225.19
4,770.87
$21,645.21
$18,502.65
*101 Petitioner calculated the depreciation of the building for the years 1954 and 1955 on the basis of $800,000 for the building and improvements, leaving $150,000 for the land and assuming an estimated remaining useful life of the building of 15 years. Petitioner also based its depreciation of the improvements prior to the acquisition of the building upon the undepreciated balance of these improvements and the unexpired term of the present leases. In 1956, petitioner adjusted the estimated remaining useful life of the building to 18 years and depreciated the undepreciated balance, $681,639.36, accordingly. Respondent increased by $105,000 the amount of the purchase price allocated to the land, thereby decreasing the amount allocated to the building to $676,497.35. Respondent also determined that the building, as well as the improvements to the building made prior to the date of acquisition, should be depreciated over a life of 30 years. These determinations by respondent reduced the claimed depreciation deductions for 1954, 1955, and 1956 of $51,034.47, $56,721.73, and $42,711.68 by $29,610.26, $32,301.97, and $18,070.99, respectively. On July 1, 1953, Julius Epstein purchased the *102 building from Arthur and Stella Sanford. The contract, hereinafter called the land contract, provided for a purchase price of $891,581.84, $241,581.84 to be paid upon execution of the agreement and the balance of $650,000 to be paid over the ensuing 20 years with interest at 3 1/2 percent. Installments of $26,000 per year for the first 5 years and payments of $39,000 per year for the next 15 years were to be applied, first to interest and then to principal, and the balance to be paid on July 1, 1973. Epstein was entitled to the delivery of a warranty deed of the premises at any time after the principal of the debt was reduced to $450,000. A short form of this land contract was filed for record. No personal liability was incurred by Epstein or any successors in interest on the land contract. The sellers' sole remedy, in the event of default, was the cancellation of the contract and recovery of the property. On September 30, 1953, Elmer J. Babin, acting for himself and Epstein, purchased the land contract from Epstein, "as agent," for $926,000. Babin made a $10,000 down payment, agreeing to take title subject to the balance of the land contract due and to pay $266,000 upon delivery *103 of an assignment of the land contract on January 31, 1954. Babin filed the articles of incorporation for petitioner on October 12, 1953, and a charter was granted on the 15th of that month. The corporate life of petitioner was 20 years with a right of renewal as provided by law. The corporation was authorized to issue 600 no-par shares of nonassessable common stock for $100 per share in cash or property valued by the board of directors. In addition, petitioner had the power to borrow money and issue bonds or other evidence of indebtedness. The first meeting of the directors of the Davidson Building Company was held on January 5, 1954. At this meeting the corporation accepted an assignment of the September 30 contract as full payment for 240 shares of no-par common stock subscribed for by Babin and Epstein. Babin and Epstein each received 120 shares of stock from this subscription with an assigned value of $100 per share. The remaining 360 shares were subscribed for by 15 individuals at a cash price of $100 per share, on the condition that for every 5 shares of stock purchased the subscriber would purchase 2 debentures to be issued by the corporation. Revenue stamps were attached *104 for all shares issued. A total of 144 debentures was issued, each with a face value of $1,800. The bonds had a fixed maturity, with two bonds to be retired each month for 6 years beginning March 10, 1954, and proceeding through February 10, 1960. The debentures did not pay interest, but were issued at a discount equivalent to 5 percent per annum from the issuing date to the maturity date of the individual debenture. The stock was subscribed for in 15-share blocks with the corresponding purchase of 6 debentures. Out of each block of 6 debentures, one was to be retired on the same day every year for 6 years. The date of retirement for the 24 groups of bonds was determined by lot. All the debentures maturing from March 1954 through December 1956 were retired in accordance with the schedule and no additional ones were retired. Formal registered debentures were issued providing, in summary, the following rights of the holders and the conditions of acceptance: 1. Debtor has free right of prepayment but only if all prior maturities have been paid; 2. While the rights of the debenture holders are equal with others, these rights are superior both to general creditors and to stockholders; *105 3. The terms of the debentures may be modified by a vote of two-thirds of the holders but neither maturity nor principal balance may be altered; 4. Petitioner may pay no dividends nor redeem any stock until all debentures are paid in full; 5. Debentures are registered as to owner and can be transferred only on the books of the company by the holder or an authorized agent, authenticated by a trustee's certificate; 6. Debentures are secured by a deed of trust running to the Union Bank of Commerce Company of Cleveland, Ohio, as trustee; 7. Holder registered as such on petitioner's and trustee's records may be deemed absolute owner for payment and other purposes; 8. The debenture is the obligation of petitioner alone, and no recourse shall be had against any stockholder, officer, or director of petitioner. Neither Babin nor Epstein was required to purchase debentures in connection with the 240 shares issued to them for the contract. Babin purchased 30 additional shares of stock for $3,000 and purchased the corresponding 12 debentures. Petitioner realized $36,000 from the sale of stock and $226,267.76 from the sale of the debentures as shown by the following schedule: Subscrip
-
Stockholder
Number
tion
Discount
Number
Bondholder
of Shares
Price
Price
Discount
Face
of Bonds
B. Sands
15
$ 1,500
$ 9,619.83
$ 1,180.17
$ 10,800
6
Weisman
45
4,500
28,542.22
3,857.78
32,400
18
Hipps Realty
30
3,000
18,958.91
2,641.09
21,600
12
Hexter
60
6,000
37,642.97
5,557.03
43,200
24
Joseph
15
1,500
9,548.55
1,251.45
10,800
6
Bernstein
30
3,000
18,889.48
2,710.52
21,600
12
Garson
30
3,000
18,820.49
2,779.51
21,600
12
S. Selman
15
1,500
9,478.31
1,321.69
10,800
6
Fink
15
1,500
9,478.31
1,321.69
10,800
6
Babin
30
3,000
18,684.06
2,915.94
21,600
12
G. Sands
15
1,500
9,409.10
1,390.90
10,800
6
Ullman
15
1,500
9,340.93
1,459.07
10,800
6
Bamberger
15
1,500
9,307.20
1,492.80
10,800
6
W. Selman
15
1,500
9,273.70
1,526.30
10,800
6
Goodman
15
1,500
9,273.70
1,526.30
10,800
6
360
$36,000
$226,267.76
$32,932.24
$259,200
144
Amount realized
$262,267.76
*106 The proceeds from the sale of securities was used to pay Babin for the $10,000 down payment made pursuant to the September 30 contract and to complete the terms of the purchase under the same contract. On January 21, 1954, petitioner paid Epstein $251,414.83 and on February 17 Epstein received an additional $30.45. Epstein assigned the land contract and executed a blanket assignment of the leases to petitioner. These assignments were promptly recorded. Upon receiving the assignment of the land contract from Epstein, petitioner executed and delivered to the Union Bank of Commerce Company, Trustee, a deed of trust conveying the land contract to the bank in trust to secure the payment of the debentures according to their terms. The deed of trust was recorded in Woodbury County, Iowa, and documentary stamps were attached to the deed of trust based on the consideration for which the debentures were issued. The deed of trust contained the following provisions: 1. For the registration and certification by the trustee of all debentures secured thereby; 2. That the issuing corporation shall pay all sums when due on debentures, take care of the trust property, make repairs, pay taxes, *107 permit no priorities or subsequent liens superior to debentures, make no structural changes, comply with all laws, give chattel mortgages where required by the trustee, and give the trustee access to the property; 3. That the debtor comply with the terms of the land contract or be held in default; 4. For control over insurance proceeds to protect the debenture holders in the event of an insured casualty loss; 5. For the payment of taxes and assessments; 6. For the prepayment of debentures; 7. For the making of advances by the trustee and performing acts required of petitioner should petitioner fail to perform; 8. For the right to foreclose in the event of default, including the right to accelerate, appoint a receiver, collect rents and distribute proceeds in the event of sale, first to debenture holders to pay interest and principal and then to petitioner; 9. For the right of two-thirds in number of debenture holders to compel such action on the part of the trustee; 10. For the right of 35 percent of debenture holders to institute such action independently after notice to the trustee; 11. For the release of the lien upon payment of all the debentures. The books *108 of petitioner reveal the following opening journal entries, all bearing the date of January 31, 1954: Land
$ 24,000.00
Capital Stock
$ 24,000.00
To record issuance of stock for purchase contract
of the Davidson Building, Sioux City, Iowa, 240
shares.
Land
$126,000.00
Building
781,497.35
Building Improvements
18,502.65
Prepaid Insurance
3,964.77
Mortgage Payable - Dee Building Co.
$648,662.93
Accrued Real Estate Taxes
18,239.36
Accrued Interest
1,617.20
Contracts Payable
261,445.28
To record purchase of real estate subject to land
contract payments at 3 1/2% interest.
Accounts Receivable - Debentures
$226,267.76
Debenture Discount
32,932.24
Debentures Payable
$259,200.00
To record issuance of debentures according to
schedule. 144 debentures redeemable at $1,800.00
each over 6 years.
Accounts Receivable - Stock
$ 36,000.00
Capital Stock
$ 36,000.00
To record issuance of stock in accordance with
subscriptions. 360 shares at stated value of
$100.00.
The payments to Babin and Epstein totaling $261,445.28 constituted payment in full of the amount designated "Contract payable." On its 1954, 1955, and 1956 returns, *109 petitioner claimed a pro rata portion of the difference between the issuing price of its debentures and the amount which petitioner was required to pay upon the maturity thereof as a business deduction. The claimed "debenture discount" amounted to $8,321.13, $8,040.95, and $6,532.89, respectively. Respondent determined that the debentures to which the discount related were in the nature of capital contributions rather than valid evidences of indebtedness; and, accordingly, the amortization attributable to the debentures was not deductible. The basis of the property in 1954 was $950,000, of which $781,497.35 was allocable to building, $18,502.65 was allocable to tenant improvements, and $150,000 was allocable to the land. The useful life of the building and improvements was 25 years. The debentures issued by petitioner evidenced genuine indebtedness and the "debenture discount" thereon was amortizable as interest on indebtedness. Opinion Since respondent's determination does not question the (cost) basis of the property, the principal phases of the issue relating to depreciation are the allocation of basis between land and building, the building's anticipated useful life, *110 and the useful life of certain improvements if not identical with the life of the building. These items have been disposed of in our findings of fact. We regard petitioner's evidence as having overcome the presumption of correctness of respondent's determination as to the allocation of basis between land and building. Petitioner produced two opinion witnesses whose testimony, based on transactions involving comparable properties [1] and potential income from the most advantageous use of the ground, led to their conclusion that the fair market value of the land on the date of acquisition was $150,000. We have accordingly found that, of the total cost, $150,000 is to be attributed to the land and the balance of $800,000 to the building. *111 The anticipated useful life of the building is based on a consideration of all of the evidence and represents a figure less than that contended for by respondent but greater than petitioner's estimate. As to the useful life of other improvements, we are unable to determine from the record that these will not be usefully employed for the entire life of the building notwithstanding that they may have been installed from time to time either by petitioner's predecessor or by petitioner in response to some especially emergent requirement. Respondent makes some attempt at this point, basing his contention on certain testimony for petitioner, to suggest that petitioner's basis is its equity rather than the total amount of cash paid and obligations assumed. But, even if this contention were otherwise tenable, cf. Crane v. Commissioner, 331 U.S. 1 (1947), there is no evidence in the record to sustain respondent's burden of proving the facts required to support any such position. The necessary adjustments to conform the final decision to our findings of fact will be taken into account in the computation under Rule 50. Although the matter is not entirely free from doubt, *112 we have concluded that petitioner correctly deducted the discount, comparable to interest, on the debentures issued by it. [2] In discussing the first issue, respondent states, for example, "In other words, the parties believed that the building would have a value of at least $300,000.00 in July, 1973." While this statement is incorrect if expressing a viewpoint related to the depreciation issue, since respondent mistakenly confuses the "building" with the property as a whole, it does indicate his agreement that the parties to the transaction anticipated that petitioner's property - possibly merely the value of the land - would, after a lapse of as much as 20 years, still be more than adequate to secure the entire extent of the debenture issue, even assuming that the debentures had not been paid off in the meantime. While it is true that the land contract required periodic payments also, the assumption to which respondent refers must have been that the income produced by the building during the 20 years in question would be adequate to sustain them. Otherwise, there would have been no $300,000 value in 1973, nor, *113 indeed, any assets remaining to petitioner since, then, the only permissible hypothesis is that the owner of the land contract would have foreclosed long since. By most of the familiar criteria, these were genuine evidences of indebtedness. They had specified maturity dates, New England Lime Co., 13 T.C. 799 (1949), not too distant in time, John W. Walter, Inc., 23 T.C. 550 (1954), bore interest which was payable regardless of earnings, Tribune Publishing Co., 17 T.C. 1228 (1952), enjoyed priorities not only over the stockholders but over all other creditors, Helvering v. Richmond, F. & P. R. Co., 90 F. 2d 971 (C.A. 4, 1937), affirming 33 B.T.A. 895 (1936), were in form and designation specified to be debt obligations, Toledo Blade Co., 11 T.C. 1079 (1948), affd. 180 F. 2d 357 (C.A. 6, 1950), certiorari denied 340 U.S. 811, and contained elaborate provisions for remedies in the event of the debtor's default, Ruspyn Corporation, 18 T.C. 769 (1952). Respondent's contention that the priorities accorded the debenture holders over other creditors was inconsequential for *114 lack of other significant indebtedness, cf. Colony, Inc., 26 T.C. 30 (1956), affd. 244 F. 2d 75 (C.A. 6, 1957), reversed on other grounds 357 U.S. 28 (1958), is without merit considering that the current obligations not in the priority class were in the order of an average of $60,000 a year, a sum many times in excess of the annual interest on the debentures. The only consideration of significance pointing in the opposite direction is petitioner's so-called "thin capitalization." Cf. Swoby Corporation, 9 T.C. 887 (1947). Viewing the figures in the light most unfavorable to petitioner and including in its debt structure the entire remaining balance under the land contract, the entire face amount of the debentures, [3] and such other priority indebtedness as unpaid real estate taxes, the ratio comes, according to respondent, to something like 15 to 1 of indebtedness to equity. In the absence of other considerations, this would no doubt be a high figure and, standing by itself, might be sufficient to indicate that the intention was to place the total investment at the risk of the business, leaving no indebtedness whatever. Isidor Dobkin, 15 T.C. 31 (1950), *115 affirmed per curiam 192 F. 2d 392 (C.A. 2, 1951).
This was not, however, as in other situations, the case of a sole stockholder, cf. Swoby Corporation, supra, of a mere reorganization of previously existing equity interests, cf. Gokey Properties, Inc., 34 T.C. 829 (1960), affd. 290 F. 2d 870 (C.A. 2, 1961); 1432 Broadway Corporation, 4 T.C. 1158 (1945), affirmed per curiam 160 F. 2d 885 (C.A. 2, 1947); Gregg Co. of Delaware, 23 T.C. 170 (1954), affd. 239 F. 2d 498 (C.A. 2, 1956), certiorari denied 353 U.S. 946, or even one where the investors received equal amounts of stock and evidences of debt, cf. R. M. Gunn, 25 T.C. 424 (1955), affirmed per curiam sub nom. Perrault v. Commissioner, 244 F. 2d 408 (C.A. 10, 1957), certiorari denied 355 U.S. 830; Edward G. Janeway, 2 T.C. 197 (1943), affd. 147 F. 2d 602 (C.A. 2, 1945); but see Leach Corporation, 30 T.C. 563 (1958). The proportion of indebtedness *116 to equity has not been regarded as the sole consideration. Rowan v. United States, 219 F. 2d 51 (C.A. 5, 1955); W. H. Truschel, 29 T.C. 433 (1957); Leach Corporation, supra. Nor is the present ratio without parallel. In Arthur V. McDermott, 13 T.C. 468 (1949), for example, there was a 19 to 1 ratio of debt to equity in a close real estate corporation. But the intent to create an indebtedness was recognized. [4] When the "ratio" is relied upon to support respondent's determination of equity investment as opposed to indebtedness, there is often an absurdly high ratio of debt to equity ranging as high as 1250 to 1, see Swoby Corporation, supra; or, if not, at least a purely nominal investment in capital stock, such as $1,200. See Alfred R. Bachrach, 18 T.C. 479 (1952), affirmed per curiam 205 F. 2d 151 (C.A. 2, 1953). The cash investment here in petitioner's capital stock alone is $36,000, and a higher figure may be justified by adding the presumed value of the land contract which was contributed for capital stock. See Sheldon Tauber, 24 T.C. 179 (1955). And where, as here, all other *117 considerations point to the reality and actuality of the indebtedness and the intention of the parties appears necessarily to require for their own purposes that the debts created be actually treated as valid obligations, we conclude on the whole record that the indebtedness was real, that the bond discount was properly amortized and that it may consequently be deducted. Decision will be entered under Rule 50. Footnotes
1. ↩
Location
Date
Size
Price
Remarks
Francis Building 5th
1947
100 ft.
$577,000
Allocation - $150,000 Land;
$427,000 8-
and Pierce North-
x
story building. One block
closer to
east corner
150 ft.
main retail area.
Pierce Street Between
1948
50 ft.
40,000
Land value estimated to
establish return
6th and 7th
or
x
on lease.
1949
150 ft.
90,000
Improvements for parking lot
purposes
7th and Pierce
1956
100 ft.
valued at 10 percent.
Petitioner's land
Southwest corner
x
considered 20 percent more
valuable
150 ft.
100,000
since one block closer to
main retail
1957
area.
7th and Pierce
Not
80 ft.
75,000
Ground sale only.
Seventy-five-year-old
Northwest corner
shown
x
building demolished.
150 ft.
Main retail area. Rental
value 2 to 5
4th and Pierce
Not shown
times that of Davidson
property.
2. Sec. 1.61-12(c)(3), Income Tax Regs.↩
3. Including, of course, the discount figure treated as interest by both parties.↩
4. See Caplin, The Caloric Count of a Thin Incorporation, 17 N.Y.U. Institute on Federal Taxation, pp. 778-783.↩