*Decision will be entered under Rule 50.*

HUNT FOODS AND INDUSTRIES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4025-67. Filed February 22, 1972.

634

*Hilbert P. Zarky*, for the petitioner.[1]
*Robert H. Feldman*, for the respondent.

SIMPSON, *Judge:* The respondent determined deficiencies in the petitioner's Federal income tax of $803,786.42 for the taxable year ended June 30, 1962, and $572,199 for the taxable year ended June 30, 1963. In his amended answer, the respondent claimed an additional deficiency of $107,389.40 for 1963. Most of the issues in the case have been settled; the one issue remaining for decision is whether a corporation which issues convertible debentures at par may allocate part of the proceeds to the conversion privilege with the result that the debentures are considered to be issued at a discount which is deductible as interest.

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Hunt Foods & Industries, Inc., is a corporation which was organized under the laws of the State of Delaware, and which maintained its principal office in Fullerton, Calif., at the time of filing its petition in this case. It filed its Federal income tax returns, using the accrual method of accounting, for the taxable years ended June 30, 1962, and June 30, 1963, with the district director of internal revenue, Los Angeles, Calif.

On June 28, 1961, the petitioner issued and sold its convertible debentures in the total principal face amount of $38,799,500. Such debentures were issued under an indenture (the indenture) dated July 1, 1961, and were a valid, subsisting obligation of the petitioner. They were sold through a subscription offering to the petitioner's stockholders, with the unsubscribed portion being purchased by certain underwriters. The debentures sold through the subscription offering were sold by the petitioner at 100 percent of their principal face amount at a total sales price of $37,682,900. The unsubscribed debentures, which were in the face amount of $1,116,600, were resold

---

[1] Brief *amicus curiae* was filed by Walter J. Rochler, Julius M. Greisman, and Richard L. Hubbard as counsel for the J. P. Stevens & Co., Inc.

by the underwriters at 111½ percent of the principal amount, and the underwriters remitted the net proceeds of such sales to the petitioner. Thus, the proceeds realized by the petitioner from the sale of the debentures and the remittances of the underwriters' net proceeds were in the aggregate amount of $38,927,909, or 100⅓ percent of the face value of the total debentures issued. The excess of proceeds over face value was treated by the petitioner as premium on its income tax returns, subject to amortization as income.

All of the debentures were issued with interest coupons attached, and bore annual interest of 4⅜ percent, the interest being payable semiannually on July 1 and January 1 of each year. Prior to July 1, 1966, they were, subject to certain antidilution provisions of the indenture, convertible into 1.852 shares of the petitioner's common stock for each $100 face amount of debentures converted; subsequent to July 1, 1966, and prior to July 1, 1971, the debentures were convertible into 1.724 shares of the petitioner's common stock for each $100 face amount of debentures converted. After June 30, 1971, the debentures were not convertible.

The debentures were made due and payable on July 1, 1986. The indenture provided in part that the petitioner would pay into a sinking fund on or before July 1 of each of the years 1972 to 1985, inclusive, an amount sufficient to redeem on July 1 of each such year not less than 5 percent nor more than 10 percent of the aggregate principal amount of the debentures outstanding on July 1, 1971. At the option of the company, debentures acquired (otherwise than through conversion) or redeemed were to be credited against the sinking fund requirements. The debentures were subject to redemption, on at least 35 days' prior notice, through operations of the sinking fund, on any June 30 from 1972 to 1985, inclusive, at 100 percent of the principal amount, or at any time during the years 1961 to 1985 at the option of the company, in whole, or in part by lot, at prices ranging from 104⅜ percent of the principal amount in 1961 to 100 percent of the principal amount in 1981, and thereafter in accordance with a table set forth in the indenture. Also, they were subordinated as to principal and interest to all senior indebtedness as provided in the indenture.

During the year ended June 30, 1962, debentures in the face amount of $39,000 were converted, and during the year ended June 30, 1963, debentures in the face amount of $600 were converted. About three-fourths of the debentures had been converted or retired by June 30, 1970, leaving a balance outstanding at that time of $9,890,600. Most of the conversions and purchases occurred after June 30, 1966.

The straight-debt value of the convertible debentures was $87.25 for each $100 face amount; that is, if the debentures had been issued

without any conversion privilege, but had contained all of the other provisions appearing in the indenture, they could not have been sold at a price in excess of $87.25 per $100 face amount. In order to have realized the face value on the issuance of a debenture of the same kind without a conversion privilege, the petitioner would have had to have offered a coupon rate in excess of 5.30 percent, probably 5.75 percent, instead of the 4⅜-percent interest rate which the convertible debentures actually bore.

The petitioner, as is customary under generally accepted accounting principles, treated the debentures as a liability equal to the principal amount thereof in its books of account and financial statements. Its financial statements for fiscal years 1962 and 1963 and certain other years contain footnotes, which explained the basic conversion and redemption features of the debentures. Moreover, the petitioner did not take a deduction on its books or in its financial statements for any discount (as distinguished from expenses of bond issuance) with respect thereto.

Also, the petitioner did not claim a deduction on its original income tax returns for the years 1962 and 1963, nor on its amended return for fiscal year 1962, for amortizable bond discount; it claimed such deductions for the first time in the petition in this case.

OPINION

Interest paid on indebtedness is deductible under section 163 of the Internal Revenue Code of 1954.[2] On December 23, 1968, the regulations under that section were amended to provide in part:

Sec. 1.163-3  Deduction for bond discount.
(a) *Discount upon issuance.*—(1) If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be prorated or amortized over the life of the bonds. For purposes of this section, the amortizable bond discount equals the excess of the amount payable at maturity (or, in the case of a callable bond, at the earlier call date) over the issue price of the bond (as defined in paragraph (b)(2) of § 1.1232-3). [Income Tax Regs.]

At the same time, the regulations under section 1232, which taxes the holder of a bond on the original issue discount, were also amended to provide in part:

In the case of an obligation which is convertible into stock or another obligation, the issue price includes any amount paid in respect of the conversion privilege. However, in the case of an obligation issued as part of an investment unit consisting of an option and a bond, debenture, note, or certificate or other evidence of indebtedness, the issue price of the obligation includes only that portion of the initial offering price or price paid by the first buyer properly allocable to the

---

[2] All statutory references are to the Inetrnal Revenue Code of 1954, unless otherwise indicated.

obligation under the rules prescribed in subdivision (ii) of this subparagraph. * * * [Sec. 1.1232–3(b)(2)(i), Income Tax Regs.]

The provisions allowing a deduction for discount as interest were not new—similar provisions have been included in the regulations since 1918 (Art. 544(3)(a), Regs. 45); but the provision defining the issue price of a convertible debenture was included in the regulations for the first time. The petitioner vigorously challenges the validity of such regulations; it argues that part of the proceeds which it received for the convertible debentures was attributable to the conversion privilege; that only $87.25 of the amount received for each debenture was properly allocable to the debt obligation; that the debt was issued at a discount; that the discount was an additional cost of borrowing the money; and that it is therefore entitled to amortize and deduct such cost over the period the debenture was outstanding. It asserts that convertible debentures and investment units are substantially similar and that the regulations are unreasonable in treating them differently. In the alternative, the petitioner argues that the respondent acted arbitrarily in making the new rules applicable retroactively to taxable years prior to the adoption of the regulations. Such are the issues that we must decide in this case.

Convertible debentures were not new creatures of the 1960's. 1 Dewing, Financial Policy of Corporations, ch. 9 (1953 ed.); Fleischer & Cary, "The Taxation of Convertible Bonds and Stock," 74 Harv. L. Rev. 473 (1961). The early cases and rulings indicate that many convertible debentures had been issued in the early days of the income tax laws; such cases and rulings dealt with questions as to the tax consequences of the issuance of such debentures. I.T. 2347, VI–1 C.B. 86 (1927), related to the tax consequences of the exercise of the conversion privilege, but the ruling apparently assumed that the issue price of the debenture included the entire amount received for it, including the amount paid for the conversion privilege. Similarly, G.C.M. 9674, X–2 C.B. 354 (1931), held that when the conversion privilege was exercised, no deduction was allowable for any unamortized discount, but the G.C.M. clearly assumed that in computing the discount, the issue price included the entire amount received for the debenture. In *Pierce Oil Corporation*, 32 B.T.A. 403 (1935), the Board of Tax Appeals considered the tax consequences of the exercise of the conversion privilege contained in convertible debentures; the Board also treated the entire amount received for the debenture as the issue price. Although these early rulings and cases did not expressly consider whether the issue price of a convertible debenture should include any amount paid for the conversion privilege, they consistently treated the issue price as including such amount. *Liquid Carbonic*

*Corporation*, 34 B.T.A. 1191 (1936) ; see also *Great Western Power Co.* v. *Commissioner*, 297 U.S. 543 (1936). No ruling or case held otherwise; and there is no indication that anyone even argued that the rule was otherwise. Without considering the possibility of an alternative rule the practice seems to have been clearly established that the issue price included the entire amount received for the convertible debenture.

It appears that since those early rulings and cases, the concept of issue price established by them has been continued. In 1950, the Supreme Court, in *Commissioner* v. *Korell*, 339 U.S. 619, held that when a convertible debenture was issued at a premium, the issue price included the entire premium. The respondent contended in that case that a holder of a convertible debenture should not be allowed to deduct the portion of the premium attributable to the conversion privilege, but the Court rejected that argument on the basis that the common understanding of the term premium included the entire amount paid for the debenture.

Section 1232 was enacted in 1954 and, for the first time, expressly declared that the holder of a bond issued at a discount was taxable on the discount as ordinary income. In connection with the enactment of that provision, there is no indication that Congress specifically considered how the provision should be applied to convertible debentures; it must therefore be assumed that in using the term "issue price," Congress had in mind the meaning of the term which was then prevalent. Sec. 1232; S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., p. 112 (1954). There is no evidence to indicate that the term was intended to include only the amount paid for the debt value of a convertible debenture. On the contrary, in view of the earlier rulings and cases in which the issue price of convertible debentures had been treated as including the amount paid for the conversion privilege, it seems most likely that the term was intended to include the entire amount received for a convertible debenture for purposes of determining whether the debenture was issued at a discount.

In *Roberts & Porter, Inc.*, 37 T.C. 23 (1961), this Court held that when a corporation reacquired its convertible note, it could not deduct the part of a premium which it paid for the conversion privilege. However, our decision was reversed by the Seventh Circuit for the reason that the Court of Appeals believed that there was no basis for so restricting the term premium. *Roberts & Porter, Inc.* v. *Commissioner*, 307 F. 2d 745 (C.A. 7, 1962). In other cases involving the deductibility of a premium paid by a corporation to reacquire its convertible indebtedness, the decision of the Seventh Circuit has been followed. *Head Ski Co.* v. *United States*, 454 F. 2d 732 (C.A. 4, 1972),

and *Southwest Grease & Oil Co.* v. *United States*, 435 F. 2d 675 (C.A. 10, 1971).

In 1969, section 1232 was amended, generally, to require holders of bonds and other evidences of indebtedness which were issued at a discount to include the discount in income pro rata over the life of the obligation. The amendment applies to a bond or other evidence of indebtedness which is issued separately or which is issued as a part of an investment unit that includes warrants to purchase stock and provides that, in the case of an investment unit, the issue price of the bond includes only the value attributable to it. Sec. 1232(b)(2). Manifestly, Congress was aware of the existing regulations under section 1232 and the definitions included in those regulations; yet, it did not provide for the allocation of the amount received for a convertible debenture between the debt and conversion privilege. The failure to provide for such an allocation seems to indicate that Congress accepted the definition of issue price in the regulations and assumed that no allocation was appropriate in the case of a convertible debenture; otherwise, the amendment was incomplete for it would fail to treat the holders of convertible debentures in the same manner as holders of other obligations. S. Rept. No. 91–552, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 423, 516–517.

In the 1960's, the Accounting Principles Board of the American Institute of Certified Public Accountants took a position on the treatment of convertible debentures for accounting purposes. In opinion No. 10 issued in 1966, the APB advised accountants to allocate the proceeds of convertible debentures between the debt value and the conversion privilege. However, after extensive deliberations, the board issued opinion No. 14 in 1968 in which it reversed its position; in that opinion, it took the position that for accounting purposes, the convertible debenture should be treated as a single indivisible obligation. The entire amount received for a convertible debenture should be treated as its issue price. Its conclusion was based on the belief that such an approach was more practicable for accounting purposes and more truly reflected the economic realities of a convertible debenture. Of course, in interpreting the internal revenue laws, we are not required to adopt the practices of the accounting profession (*Schlude* v. *Commissioner*, 372 U.S. 128 (1963); *American Automobile Assn.* v. *United States*, 367 U.S. 687 (1961); see generally Gerver, "Differences Between Book and Tax Accounting," 5 Taxation for Accountants 28 (March 1970)); yet, its conclusions here are consistent with the way in which convertible debentures had been treated for tax purposes, and those conclusions reenforce the propriety of the tax treatment. Other writers on the subject have generally reached the same conclusions as the accounting profession. Fleischer & Cary, *supra;*

Note, "The Tax Consequences of Redemption of Convertible Bonds," 49 B. U. L. Rev. 96 (Winter 1969) ; DeKosmian, "Original Issue Discount," 22 Tax Lawyer 339, 360 (1969) ; but see Crawford, "Amortization of Conversion Feature Discount: What is the Proper Treatment?", 32 J. Taxation 102 (Feb. 1970).

The issue in this case was recently considered by the Second Circuit in *Chock Full O' Nuts Corporation* v. *United States*, 453 F. 2d 300 (C.A. 2, 1971). In that case, the issuer of convertible debentures also allocated a part of the amount received for them to the conversion privilege and treated the remainder as allocable to the debt value. As a result, it claimed a deduction for original issue discount. However, both the District Court and the Court of Appeals rejected the taxpayer's claim. The Second Circuit concluded that the regulatory definition of issue price in the case of convertible debentures was reasonable, and that although the definition had not been set forth in the regulations previously, it represented the meaning of the term "issue price" throughout the years. Accordingly, the court also concluded that it was appropriate to apply such definition to the year 1961, the year in issue in that case.

Moreover, there are sound reasons for the longstanding practice of treating the issue price of convertible debentures as including the entire amount received for the debenture. Deductible interest is compensation for the use of money. *Deputy* v. *duPont*, 308 U.S. 488 (1940) ; *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552 (1932). When original issue discount is treated as interest, it is because of the anticipation that on redemption of the obligation more will be paid than was received for it. *Old Mission Co.* v. *Helvering*, 293 U.S. 289 (1934) ; *Helvering* v. *Union Pacific R. Co.*, 293 U.S. 282 (1934). However, a convertible debenture is a hybrid type of security—it is neither pure debt, nor pure equity. Consider, for example, a convertible debenture which is initially sold for $100, which is to be redeemed for $100 if not converted, but which is convertible into stock at the option of the holder. Obviously, if the debenture is held to maturity and not converted, the holder will receive full payment of the amount which he advanced. Certainly, the obligor will not be required to repay more than it received; and thus, there is no basis for allowing a deduction for discount. *Old Mission Co.* v. *Helvering*, *supra; Helvering* v. *Union Pacific Co.*, *supra*. In fact, if the conversion privilege is exercised, no cash payment will have to be made by the obligor; stock will be substituted for the debt, and it has long been held that when there is a substitution of stock for debt, it is not to be treated as a payment of cash. *Liquid Carbonic Corporation*, *supra; Pierce Oil Corporation*, *supra; C., R. I. & P. Railway Co.*, 13 B.T.A. 988 (1928), affirmed

and reversed on other issues 47 F. 2d 990 (C.A. 7, 1931), certiorari denied 284 U.S. 618 (1931).

The petitioner's contention that the convertible debentures were issued at a discount rests on the proposition that a part of the proceeds of the debentures should be allocated to the conversion privilege and that only the remainder was paid for the debt. Thus, it asks us to treat the convertible debenture as including two separate obligations. However, such proposition is contrary to the practice that has apparently generally been followed throughout the years and ignores the realities of a convertible debenture. Such a security does not consist of two separate and independent obligations; the obligations are in the alternative. If the debt is repaid, the lender will be repaid all that he has advanced; but if the conversion privilege is exercised, no cash will be paid. Under these circumstances, there is no basis for assuming that the issuing corporation will be obligated to repay more than it received; to make the suggested allocation, with the resulting deduction for discount, would ignore the substance of the transaction.

In 1950, Congress amended section 125 of the 1939 Code (now sec. 171) to provide that when a convertible debenture is issued at a premium, the value of the conversion privilege must be ascertained, and the holder is not entitled to deduct such value. Sec. 217, Revenue Act of 1950, 64 Stat. 906, 941. In 1969, Congress added section 249 to provide that when a corporation reacquires a convertible indebtedness issued by it, it is not entitled to deduct any amount attributable to the value of the conversion privilege. Sec. 414, Tax Reform Act of 1969, 83 Stat. 487, 612. The petitioner argues that by these amendments, Congress recognized that part of the price of a convertible debenture is allocable to the conversion privilege and that the regulations are unreasonable in not recognizing such an allocation where it would result in a discount.

We are not persuaded by that argument. Congress considered it to be a loophole to allow a holder of a convertible debenture a deduction for the amount that he paid for the conversion privilege, and the purpose of the amendment was to close such loophole. S. Rept. No. 2375, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 517–518. Likewise, Congress considered that when a corporation reacquired its own convertible indebtedness, any amount that was attributable to the purchase of the conversion privilege was in the nature of a capital expenditure that should not be deductible. S. Rept. No. 91–552, *supra* at 518. Those amendments were enacted to deny the holder and the issuer of convertible debentures deductions for capital expenditures; it certainly does not follow that a corporation which issues convertible debentures should be allowed to allocate a part of the issue price to the conversion privilege and to deduct discount as a result of such allocation. There is no reason

642

to believe that Congress would approve of the creation of deductions in such a manner.

The petitioner also contends that, for discount purposes, a bond which is issued with a separate warrant or option is, in substance, no different than an obligation which contains a covenant granting the holder the right to exchange the bond for stock of the issuer. Thus, it argues that each is a "package" containing an obligation and an option, that a single unallocated price is paid for each, and that with respect to each, the values of the obligation and the option are separately ascertainable. Even though these similarities exist, there are also material differences between the convertible debenture and the investment unit.

An investment unit is composed of two separate securities—an obligation and an option. The two securities are legally, as well as physically, independent of each other and have their own separate markets. 6A Fletcher, Cyclopedia Corporations, sec. 2641 (1968). Thus, the purchaser of an investment unit may continue to hold the obligation while disposing of the option, or he may continue to hold the option while disposing of the obligation. Ordinarily, he may exercise the option and at once become simultaneously a stockholder and a creditor of the issuer. In this connection, it appears that it is ordinarily appropriate for an issuer of the investment unit to make some immediate dedication of capital with respect to the outstanding option of its stock. Dewing, supra at 265–266. More importantly, the obligor will, in any and all events, be required to pay the debt included in an investment unit on its due date.

On the other hand, a convertible obligation is a single security. The call upon the issuer's stock is in the form of a covenant. The option and the obligation have no separate physical or legal independence. See Fletcher, supra, sec. 2692 et seq. Title to the bond passes with the option in the same instrument. Since the option and the obligation cannot be sold separately, the holder must either be a creditor of the issuer or one of its stockholders; he cannot simultaneously enjoy the rights of both. Also, there would be no occasion to allocate values separately for the purpose of ascertaining the basis of each component of the convertible debenture under section 1012. It is ordinarily inappropriate for the issuer to make an immediate dedication to capital with respect to the option privilege in a convertible debenture. Opinion No. 14, Opinions of the Accounting Principles Board. In addition, where the conversion privilege is exercised, the obligation will never be repaid, and it is often within the power of the issuer to force conversion of the bonds. See generally Dewing, supra at ch. 9; Fleischer & Cary, supra; Berle, "Convertible Bonds and Stock Purchase Warrants," 36 Yale L. J. 649 (1926). In our opinion, the distinctions between investment units and convertible obligations provide a substantial reason for differentiating

between them with respect to the deductibility of original issue discount.

The petitioner suggests that if the treatment of convertible debentures was adopted in order to protect the holders from being taxed on original issue discount as ordinary income, the Treasury Department has no authority to adopt regulations to carry out such an objective. The petitioner also argues that the regulations here in issue should not be accorded the weight of regulations that were prepared at or about the time of the enactment of the statute by those who were especially familiar with the circumstances existing at that time; nor the weight of regulations that have been in existence for decades and have thereby stood the test of time. Griswold, "A Summary of the Regulations Problem," 54 Harv. L. Rev. 398 (1941). However, it is clear that regulations may be valid even when promulgated years after the first enactment of the relevant statutory provisions and even where they may be contrary to prior administrative practice. Cf. *Helvering* v. *Wilshire Oil Co.*, 308 U.S. 90 (1939). There are legitimate and persuasive reasons for upholding the regulations here challenged. As we have set forth previously, the definition of issue price adopted by them is consistent with the general understanding of that term that existed throughout the years, and such definition is supportable by sound reasoning and precedent. Accordingly, there can be no basis in fact for objecting to the retroactive application of the regulations, regardless of any possible argument against retroactivity in other circumstances, for the regulations here merely articulate an interpretation of the statute which was not novel but which was in accordance with the general understanding of the statutory provisions. *Manhattan Co.* v. *Commissioner*, 297 U.S. 129 (1936). Under these circumstances, there is no reason to hold the regulations invalid merely because they were issued after the beginning of the controversy which led to this case. Compare *Commissioner* v. *Goodwyn Crockery Co.*, 315 F. 2d 110 (C.A. 6, 1963), affirming 37 T.C. 355 (1961). We therefore hold that the regulations in issue are valid and that the petitioner is not entitled to the deduction for discount claimed by it.

*Decision will be entered under Rule 50.*