RICHMOND, FREDERICKSBURG AND POTOMAC RAILROAD COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1024–70. Filed May 14, 1974.

*Frank W. Hardy,* for the petitioner.
*Robert K. Dixon,* for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in Federal income taxes against the petitioner for the taxable years 1962, 1963, and 1964 in the following amounts:

| Year | Deficiency |
|------|-----------|
| 1962 | $35,398 |
| 1963 | 633 |
| 1964 | 70,897 |

Also for determination are the overpayments in income tax claimed by the petitioner as follows:

| Year | Overpayment |
|------|------------|
| 1962 | $185,975 |
| 1963 | 34,785 |
| 1964 | 163,289 |

On December 17, 1971, the Revenue Act of 1971 was passed by the Congress amending the Internal Revenue Code. The Act provided, in

part, an additional investment credit for railroads and had retroactive effect. Based upon the change in law, petitioner, with the Court's permission, filed an amendment to its petition claiming additional overpayments for the years 1962, 1963, and 1964, of $23,444.47, $24,394.20, and $34,146.92, respectively, plus interest as provided by law. The Court also granted petitioner's motion to sever this issue from the trial of the instant case. .

In *Richmond, Fredericksburg & Potomac Railroad Co.*, 33 B.T.A. 895 (1936), the petitioner had issued "guaranteed stock" secured by a mortgage and having priority over general creditors. During the year 1929, petitioner had outstanding the same issues of 6-percent and 7-percent "guaranteed stock" as are involved in the instant case. In that year, petitioner paid "guaranteed dividends" at the specified rate to holders of its guaranteed stock. Also, in the same year, petitioner paid to its guaranteed stockholders an "excess dividend" to equalize the dividends paid its common stockholders. Petitioner claimed all such payments as deductible interest on its 1929 income tax return. The respondent disallowed the items as interest, and petitioner sought a redetermination before the Board of Tax Appeals. The Board held that the guaranteed "dividends" of 6 percent and 7 percent paid on the guaranteed stock "were, in reality, interest," and a deductible item. It further held that the "balance of the payments" or excess dividends were a distribution of profits and "clearly a dividend." Petitioner did not appeal the Board's decision with respect to the "excess dividends," but the respondent prosecuted an appeal of the Board's holding that the guaranteed portion of the dividends was interest. The Board's decision was affirmed in *Helvering v. Richmond, F. & P. R. Co.*, 90 F. 2d 971 (C.A. 4, 1937). .

The issues presented for our consideration are whether: (1) In view of the decision in the aforementioned case, petitioner is collaterally estopped to claim as deductible interest payments in excess of the guaranteed dividends made to equalize the dividends paid on its guaranteed stock with that paid on its common stock; (2) if petitioner prevails on issue (1), the amounts paid by petitioner semiannually on its guaranteed stock, in excess of the guaranteed dividends, for the purpose of equalizing the dividends paid on its guaranteed stock with that paid on its common stock are, in reality, dividends or interest; and (3) in purchasing its guaranteed stock, payments made by petitioner to holders thereof, in excess of the par value, constitute premiums paid with respect to retiring indebtedness or payments with respect to retirement of capital stock.

The parties have stipulated that the entire record of the aforenoted cases is incorporated herein by reference, including all of the pleadings, briefs, and opinion. The basic facts concerning the 6- and 7-per-

cent guaranteed stock are found in the reports of the aforementioned cases; and the facts set out in the opinions of the two tribunals are applicable to the instant proceeding except insofar as the years and amounts involved are concerned. For convenience, the facts set forth in the prior cases will be repeated. Likewise, some of the facts, together with the exhibits, in the instant case, have also been stipulated and are so found.

### FINDINGS OF FACT

Petitioner is a Virginia corporation with its principal offices at 2500 West Broad Street, Richmond, Va.

At all times material, petitioner kept its books of account and filed its income tax returns on the accrual basis, and its taxable years were the calendar years.

Petitioner filed its income tax returns for the taxable years 1962, 1963, and 1964 with the district director of internal revenue, Richmond, Va.

Petitioner was incorporated by an Act of the General Assembly of Virginia approved February 25, 1834.

The parties in the present case are the same as those in *Richmond, Fredericksburg & Potomac Railroad Co.*, 33 B.T.A. 895 (1936), affd. *Helvering* v. *Richmond, F. & P. R. Co.*, 90 F. 2d 971 (C.A. 4, 1937).

Petitioner had outstanding during the calendar years 1962, 1963, and 1964, guaranteed stock as follows: $481,100 par value 7-percent guaranteed stock; $19,300 par value 6-percent guaranteed stock. This stock had been issued under authority of the General Assembly of Virginia in accordance with certain resolutions of the petitioner's directors and stockholders.

Petitioner issued 7-percent guaranteed stock in the amount of $200,-000 known as "Issue E" issued under an Act of the General Assembly of Virginia passed February 13, 1856, the pertinent provisions of which are as follows:

2. The Richmond, Fredericksburg and Potomac railroad company, for the purpose of carrying out the objects of this and any other acts in relation to said company, are hereby authorized to increase their capital stock in such manner as they may deem most advisable, to the extent of one million dollars, in addition to the amount hitherto authorized; or the said company, to such extent as they may deem it advisable to do so, may borrow money, at a rate of interest not exceeding seven per centum, and issue proper certificates or evidences of debt therefor, and make the same convertible into stock, at the pleasure of the holder; and may secure the punctual payment of the principal and interest of such loans by a deed of trust on all the property of the company, and its franchises: provided that the aggregate amount of stock and convertible loan issued under authority of this section shall not exceed the sum of one million of dollars: and provided further, that no certificate of loan convertible into stock, or creating any lien or mortgage of the property of the company, shall be

issued by the said company unless the expediency of making a loan on such terms and of issuing such certificates shall have first been determined on at a general meeting of the stockholders, by two-thirds of the votes which could legally be given in favor of the same, and that no certificates of debt issued under this act shall be sold at less than the par value thereof:

The $200,000 7-percent guaranteed stock known as "Issue E" was also issued pursuant to resolutions of stockholders of May 27, 1857, which were as follows:

RESOLVED, That the said two thousand shares be and the same are hereby increased the amount of two thousand shares.

RESOLVED, That the said two thousand shares be and the same are hereby constituted a guaranteed stock, entitled under any circumstances, to receive seven per cent. per annum, and that the President and Directors be, and they are hereby, instructed to pay semi-annual dividends on the said shares, on the first days of May and November of each year, of not less than three and a half per cent., any holder of the said guaranteed shares being privileged to receive any excess of semi-annual dividend beyond three and a half per cent., which may be at any time paid on the common stock of the Company, without impairing the guaranty of seven per cent. per annum given by this resolution.

RESOLVED, That for the purpose of securing beyond any contingency, the payment of seven per cent. per annum on the guaranteed shares created by the above resolutions, the President and Directors be and they are hereby irrevocably instructed, in the event of its being at any time hereafter deemed requisite or advisable for this Company, to give a deed of trust or mortgage on any of its property or privileges, to embrace the shares of stock hereby created, in the first deed of trust or mortgage which may be given by the Company, and to protect the guaranty given in the preceding resolution, by making the principal of the whole guaranteed stock created by the above resolutions, and seven per cent. dividend on the same, part of a first lien on all the property, rights, privileges and franchises of the Company, and a debt of the Company immediately payable in the event of any default in the punctual payment of the dividends hereby guaranteed.

Petitioner also issued 7-percent guaranteed stock in the amount of $127,100 and $19,300 6-percent guaranteed stock known as "Issue F" under an Act of the General Assembly of Virginia of December 13, 1865, which provided:

Chap. 210.—An ACT to increase the Capital Stock of the Richmond, Fredericksburg and Potomac Railroad Company.

\*　　\*　　\*　　\*　　\*　　\*　　\*

1. BE IT ENACTED BY THE GENERAL ASSEMBLY, That the Richmond, Fredericksburg and Potomac railroad company be and they are hereby authorized to increase the capital stock of the company to such extent as may be requisite to enable them to liquidate all arrears of debts, interest and dividends of the company, and to make such portion of the said increased capital stock as they may deem advisable, a guaranteed stock, on which dividends of not exceeding seven per centum per annum may be guaranteed to be paid semiannually: provided, that such increase of the capital stock of the company shall not exceed in the aggregate the sum of one million dollars.

Also, petitioner issued guaranteed stock in the amount of $127,100 and $19,300 guaranteed stock known as "Issue F" pursuant to resolutions of stockholders of November 21, 1866, which provided:

RESOLVED, That the President and Treasurer of the Company be, and are hereby authorized and instructed to issue certificates of guaranteed seven per cent. stock, in shares of one hundred dollars each, expressing on their face, that the holder shall be entitled to receive from this Company on the first days of May and November of each year not less than three and a half dollars per share; for the punctual payment of which, at its office in the City of Richmond, this Company pledges its property, profits and franchises to such holders of its seven per cent. bonds, interest, coupons or guaranteed stock of the Company, as shall, before the 1st day of March, 1867, consent to receive the same in liquidation of an equal amount of the interest or guaranteed dividends upon the said seven per cent. bonds or coupons, or guaranteed stock of this Company then due and unpaid, which shall then be held by them respectively, including all interest then accrued on such interest coupons, installments of interest or guaranteed dividends, from the dates when such interest coupons, installments or interest or guaranteed dividends were severally payable, until the 1st day of January, 1867.

Petitioner also issued 7-percent guaranteed stock in the amount of $131,200 known as "Issue G" under an Act of the General Assembly of Virginia passed February 13, 1856, the pertinent provisions of which are as follows:

The Richmond, Fredericksburg and Potomac railroad company, for the purpose of carrying out the objects of this and any other acts in relation to said company, are hereby authorized to increase their capital stock in such manner as they may deem most advisable, to the extent of one million of dollars, in addition to the amount hitherto authorized, or the said company, to such extent as they may deem it advisable to do so, may borrow money, at a rate of interest not exceeding seven per centum, and issue proper certificates or evidences of debt therefor, and make the same convertible into stock, at the pleasure of the holder; and may secure the punctual payment of the principal and interest of such loans by a deed of trust on all the property of the company, and its franchises: provided, that the aggregate amount of stock and convertible loan issued under authority of this section shall not exceed the sum of one million of dollars: and provided further, that no certificate of loan convertible into stock, or creating any lien or mortgage of the property of the company, shall be issued by the said company unless the expediency of making a loan on such terms and of issuing such certificates shall have first been determined on at a general meeting of the stockholders, by two-thirds of the votes which could legally be given in favor of the same, and that no certificates of debt issued under this act shall be sold at less than the par value thereof: * * *

Petitioner issued 7-percent guaranteed stock in the amount of $131,200, known as "Issue G," pursuant to resolutions of stockholders of November 18, 1868, said resolution being as follows:

RESOLVED, That the President and Treasurer be and are hereby authorized to issue to such of the holders of the 6 per cent. certificates of debt of this Company due 1st of July, 1869, as may elect to convert such certificates into guaranteed

stock, one share of the capital stock of the Company guaranteed to yield not less than seven (7) per cent. per annum, free of all public taxation, payable semi-annually on the first days of May and November of each year, and to participate in any larger dividend that may be declared on the common stock of the Company, for every one hundred dollars of such certificates.

Petitioner also issued guaranteed stock in the amount of $22,800, known as "Issue H," under an Act of the General Assembly of Virginia of February 13, 1856, which provided:

The Richmond, Fredericksburg and Potomac railroad company, for the purpose of carrying out the objects of this and any other acts in relation to said company, are hereby authorized to increase their capital stock in such manner as they deem most advisable, to the extent of one million of dollars, in addition to the amount hitherto authorized; or the said company, to such extent as they may deem it advisable to do so, may borrow money, at a rate of interest not exceeding seven per centum, and issue proper certificates or evidences of debt therefor, and make the same convertible into stock, at the pleasure of the holder; and may secure the punctual payment of the principal and interest of such loans by a deed of trust on all the property of the company, and its franchises: provided, that the aggregate amount of stock and convertible loan issued under authority of this section shall not exceed the sum of one million of dollars: and provided further, that no certificate of loan convertible into stock, or creating any lien or mortgage of the property of the company, shall be issued by the said company unless the expediency of making a loan on such terms and of issuing such certificates shall have first been determined on at a general meeting of the stockholders, by two-thirds of the votes which could legally be given in favor of the same, and that no certificates of debt issued under this act shall be sold at less than the par value thereof: * * *

Each issue of the guaranteed stock had individual certificates, the essential provisions of which have remained the same throughout the life of each issue.

Merely the form of the certificates of each issue of guaranteed stock has changed, being first printed and later engraved. Later certificate forms also reflected on the back of the certificate the preferences, restrictions, and limitations of the several classes of stock as provided in the charter of the railroad company, which had always applied to each such class from the date of issuance.

All issues of petitioner's guaranteed stock extended to the holder thereof full voting rights and participation in management equal to that of the holders of the petitioner's common stock.

By resolutions of the board of directors and the stockholders passed March 17, 1949, and April 18, 1949, respectively, the stock of the petitioner, including all issues of 7-percent and 6-percent guaranteed stock, was split 4 to 1.

All outstanding issues of the petitioner's 7-percent and 6-percent guaranteed stock involved in the present case are the same issues of guaranteed stock that petitioner had outstanding in 1929.

All deeds of trust granted by the petitioner to secure its guaranteed stock secure only the payment of the guaranteed dividend at the rate specified thereon and do not secure the payment of any excess dividend declared thereon for the purpose of equalizing the guaranteed stock dividend to that paid on petitioner's common stock.

Petitioner paid guaranteed dividends to the holders of the 7-percent and 6-percent guaranteed stock in the following amounts which it charged to "Account 546, Interest on Funded Debt":

| Taxable year | Amount of guaranteed dividends paid |
|---|---|
| 1962 | $32, 821 |
| 1963 | 27, 430 |
| 1964 | 23, 895 |

Petitioner deducted the above amounts from gross income in computing taxable income for each of the years, and these deductions have been allowed by the respondent.

Petitioner also paid to the holders of the 7-percent and 6-percent guaranteed stock in the years 1962, 1963, and 1964, the amounts of $60,595, $59,200, and $56,859, respectively, which amounts were necessary to bring payment to these stockholders up to the same percent which was paid to the holders of common stock and dividend obligations. These latter amounts were charged to "Account 623, Dividends" and were not deducted from gross income in computing taxable income.

On February 11, 1966, petitioner filed a claim for refund for the year 1962 with the district director of internal revenue, Richmond, Va., claiming among other things, that it was entitled to a refund of $31,509 based upon a claimed interest deduction of $60,595, representing an excess dividend paid in that year to equalize the dividends of the guaranteed stockholders to that paid its common stockholders.

On February 11, 1966, petitioner filed a claim for refund for the year 1963 with the district director of internal revenue, Richmond, Va., claiming, among other things, that it was entitled to a refund of $30,784 based upon a claimed interest deduction of $59,200, representing an excess dividend paid in that year to equalize the dividends of the guaranteed stockholders to that paid its common stockholders.

Petitioner claims in this proceeding an overpayment of $28,430 for the year 1964. This claim is based upon a claimed interest deduction of $56,859, representing an excess dividend paid in that year to equalize the dividends of the guaranteed stockholders to that paid its common stockholders.

During the years 1962, 1963, and 1964, petitioner acquired some of its outstanding 7-percent and 6-percent guaranteed stock. Petitioner paid more than par value (hereinafter referred to as premium) to the guaranteed stockholders in acquiring the guaranteed stock, and, in computing taxable income, it deducted a portion of the premium pay-

ments on its income tax returns amounting to $68,074 in 1962, $1,216 in 1963, and $62,819 in 1964. Respondent disallowed these deductions.

In its claim for refund for the taxable year 1962, petitioner also claimed it was entitled to an additional deduction of $365,124, resulting in an overpayment of $189,864. Petitioner computed the additional deductions as follows:

Net purchase price:

| | | |
|---|---|---|
| 6% guaranteed stock—54 shares | $6, 054. 38 | |
| 7% guaranteed stock—4134 shares | 463, 769. 74 | |
| | | $469, 824. 12 |
| Less: Par value ($25): | | |
| 6% guaranteed stock—54 shares | 1, 350. 00 | |
| 7% guaranteed stock—4134 shares | 103, 350. 00 | |
| | | 104, 700. 00 |
| Amount deductible | | 365, 124. 12 |

This claim for refund of $189,864 should have been reduced by $35,398, the tax attributable to the deduction of $68,074 already claimed on the income tax return for the year 1962.

In its claim for refund for the taxable year 1963, petitioner also claimed it was entitled to an additional deduction of $8,911, resulting in an overpayment of $4,634. Petitioner computed the additional deduction as follows:

Net purchase price:

| | |
|---|---|
| 7% guaranteed stock—95 shares | $11, 285. 66 |
| Less: Par value ($25) | 2, 375. 00 |
| Amount deductible | 8, 910. 66 |

This claim for refund of $4,634 should have been reduced by $632, the tax attributable to the deduction of $1,216 already claimed on the income tax return for the year 1963.

Petitioner claims in this proceeding an overpayment of $134,859 for which a claim for refund for 1964 has not been filed. The additional deduction claimed in the petition is computed as follows:

Net purchase price:

| | | |
|---|---|---|
| 7% guaranteed stock—2082 shares | $342, 001 | |
| 6% guaranteed stock—306 shares | 50, 234 | |
| | | $392, 235 |
| Less: Par value: | | |
| 7% guaranteed stock—2082 shares | 52, 050 | |
| 6% guaranteed stock—306 shares | 7, 650 | 59, 700 |
| | | 332, 535 |
| Less: Deduction claimed on return, as referred to in par. 18 of the Stipulation of Facts | | 62, 819 |
| Additional deduction claimed | | 269, 716 |

Petitioner has paid the tax shown on the returns for each of the years 1962, 1963, and 1964. Petitioner and respondent from time to time executed timely consents extending the period of limitations for assessment and collection of the tax for each of the years 1962, 1963, and 1964 to November 30, 1969. The notice of deficiencies was mailed November 28, 1969.

During the years 1962, 1963, and 1964, petitioner had outstanding four classes of stock, namely, 6-percent guaranteed stock, 7-percent guaranteed stock, common stock, and dividend obligations.

During the years 1962, 1963, and 1964, there was trading of all four classes of petitioner's stock, and the market price at which all four classes were sold was essentially the same, being on December 1 of each year respectively, $100, $112, and $150 per share.

As of January 1, 1962, 1963, and 1964, the petitioner's accumulated retained earnings, as reflected in its "Retained Income—Unappropriated" account, were $47,699,591, $47,582,138, and $48,958,742, respectively. The total net income transferred to retained earnings as of December 31, 1962, 1963, and 1964, were $3,903,354, $3,745,093, and $3,815,925, respectively, prior to the payment of the dividends in issue.

Upon purchase by the petitioner of its guaranteed stock in the years involved herein it did not retire the stock purchased, but carried the same as treasury stock in its capital stock account.

The guaranteed stock upon purchase by the petitioner could not be retired without an amendment of its charter because the stock was a part of its authorized capital structure under the laws of Virginia.

In acquiring its guaranteed stock in the year 1962, the petitioner paid the holders thereof an average price of approximately $111 per share.

The petitioner allocated $3 million for the purchase of its stock, and the price paid by the petitioner in purchasing its guaranteed stock in the year 1962 was arrived at by the petitioner paying whatever the individual stockholders thought they could get for their shares until the $3 million was exhausted.

The purchase of petitioner's guaranteed stock in 1962 was made as a part of an overall tender to acquire up to $3 million of all four classes of its stock.

The acts and resolutions enabling the petitioner to issue its guaranteed stock did not require that the stock be secured by mortgages or deeds of trust unless and until the petitioner actually granted its first mortgage or deed of trust and only then if the petitioner deemed it advisable.

The mortgages or deeds of trust securing petitioner's guaranteed stock were not granted simultaneously with the stock issuances but

came into existence after the major portion of the guaranteed stock had been issued.

The 7-percent and 6-percent guaranteed stock, except 228 shares ($22,800 par value), were covered by deeds of trust or mortgages as follows:

Richmond, Fredericksburg and Potomac Railroad Company to Edmund Randolph Robinson and John O. Steger, Trustees, dated May 27, 1871; and

Richmond, Fredericksburg and Potomac Railroad Company to Edmund Randolph Robinson and John O. Steger, Trustees, dated December 5, 1871.

Petitioner had heretofore issued three mortgages or deeds of trust, one dated April 1, 1890, to the Central Trust Co. of New York, trustee, to secure an issue of $2 million of bonds, the second a general mortgage to the Central Trust Co. of New York, trustee, dated April 1, 1903, securing $4 million par value of bonds, and the third a general mortgage dated March 1, 1941, securing $6,500,000 General Mortgage Sinking Fund 3-percent bonds. In all three of said mortgages, the prior security of the guaranteed stock was recognized except as to 228 shares of 7-percent guaranteed stock issued in 1871 declared in the deed of trust, or mortgage, first mentioned not to be a prior lien, but to be equally secured with a like amount par value of bonds issued thereunder.

Petitioner issued 7-percent guaranteed stock with a par value of $131,200 to replace 6-percent certificates of debt of the petitioner due July 1, 1869.

The guaranteed stock certificates are transferable only on the books of the petitioner.

Upon the liquidation, dissolution, or winding up of the affairs of the petitioner, whether voluntary or involuntary, the holders of the 7-percent and 6-percent guaranteed stock would be first entitled to receive the par value of such stock and, after payment of the par value thereof, the remaining assets of the petitioner would be divided pro rata among the holders of the common stock and the dividend obligations until the holders thereof had received the par value thereof, and thereafter such assets would be divided, share and share alike, between the holders of the 7-percent and 6-percent guaranteed stock, the common stock, and the dividend obligations.[1]

---

[1] The resolutions of the board of directors adopted on Mar. 17, 1949, and approved by the stockholders on Apr. 18, 1949, pursuant to which the 4-for-1 split was effected (see p. 179, *supra*), set forth the applicable provision as follows:

"(4) Upon the liquidation, dissolution or winding-up of the affairs of the Company, whether voluntary or involuntary, the holders of the Seven Per Cent Guaranteed Stock and the Six Per Cent Guaranteed Stock shall be first entitled to receive the par value of such stock, and, after payment of the par value thereof, the remaining assets of the Company shall be divided pro-rata among the holders of the Common Stock and the Dividend Obligations, until the holders thereof have received the par value thereof, and thereafter such assets shall be divided, share and share alike, between the holders of the Guaranteed Seven Per Cent Stock, the Guaranteed Six Per Cent Stock, the Common Stock and the Dividend Obligations."

During the years 1962, 1963, and 1964, petitioner paid dividends on its stock, other than guaranteed stock, in amounts of $2,194,142, $2,148,348, and $2,179,230, respectively, as reflected in its "Retained Income—Unappropriated" account.

The name given the certificates in issue by the petitioner is "Guaranteed Stock" and this stock is carried on its books of account as part of its capital stock structure.

The petitioner's guaranteed stock has no maturity date nor call provision.

OPINION

The two issues for decision are (1) whether the so-called excess dividends paid by petitioner on its guaranteed stock in amounts equal to the excess of dividends paid on its common stock over the guaranteed dividend constitute deductible interest under section 163 [2] and (2) whether the excess of the amounts paid by petitioner to reacquire some of such stock over the par value thereof, i.e., the premium, constitutes a deduction under section 1.61–12(c), Income Tax Regs.[3] Both parties seek the benefit of collateral estoppel, respondent in respect of the first issue and petitioner in respect of both issues, and it is that question to which we first direct our attention.

The parties have stipulated that the same facts found by the Board of Tax Appeals in *Richmond, Fredericksburg & Potomac Railroad Co.*, 33 B.T.A. 895 (1936), affd. 90 F. 2d 971 (C.A. 4, 1937), relative to the guaranteed stock in 1929 are applicable to the instant case except insofar as the years and amounts are concerned. In that case, the Board of Tax Appeals held that the guaranteed dividends constituted deductible interest under the predecessor of section 163 but that the so-called excess dividends did not. The opinion of the Board articulated its conclusions as follows (see 33 B.T.A. at 899):

> We conclude that the guaranteed stock constituted a debt of the petitioner and that the "dividends" of 7 percent and 6 percent paid thereon during the year 1929, aggregating $34,835, were in reality, interest. It follows that this was a deductible item.
>
> As to the balance of the payments, aggregating $25,213, we are of the opinion it was correctly disallowed. This payment was a distribution of profits and differs essentially from the fixed payments. It was clearly a dividend. *Penn Mutual Life Insurance Co.*, 32 B.T.A. 839.

---

[2] All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.

[3] This *regulation* has been replaced by sec. 1.163–3(c), Income Tax Regs., T.D. 6984, 1969–1 C.B. 38; see also Rev. Rul. 69–243, 1969–1 C.B. 56. At the trial, petitioner made a passing claim that the premium was deductible as a business expense under sec. 162 and there was some general testimony as to the business reasons for the reacquisitions. But petitioner has made no argument on brief as to the applicability of sec. 162. Accordingly, without in any way implying what our position on this issue would be, we consider it abandoned.

The respondent appealed the portion of the decision dealing with the guaranteed dividends; the petitioner did not appeal the decision denying the deduction of the so-called excess dividends. The Fourth Circuit Court of Appeals affirmed the decision of the Board, concluding (see 90 F. 2d at 974–975):

This guaranteed stock, then, while sui generis, is, in the light of all its attributes, *nothing more than a secured debt* which is not to be repaid so long as the interest payments thereon are met when due, and which entitles the lender, in addition to interest, to participate with the stockholders in the earnings and management of the business. And the guaranteed dividends paid on such stock differ in no particular from interest paid on a secured debt, and should be treated as such as a matter of corporate financing and for income tax purposes. [Emphasis added.]

As part of the rationale for its conclusion, the Fourth Circuit stated (see 90 F. 2d at 974):

Nor does the fact that the guaranteed stock shares in the profits of the corporation above the guaranteed dividends, if these are exceeded by the ordinary stock dividends, and that it has a vote in the management of the corporation, detract from its position as secured indebtedness. These incidents of stock ownership were doubtless added to the ordinary rights of a secured creditor for the purpose of making the loan attractive; but a bond does not cease to be a bond merely because a share of stock is issued with it, and if the law, as did the law of Virginia, permits some rights of a stockholder to be included in an instrument evidencing a secured debt, the rights of the creditor are not impaired by so including them.

Based upon the foregoing, petitioner argues that the instruments involved herein have been held to be debt for all purposes. Relying exclusively on *Commissioner* v. *Sunnen*, 333 U.S. 591 (1948), it asserts that respondent is collaterally estopped from contending that either the so-called excess dividends or the premium is nondeductible. Respondent contends, also on the basis of *Commissioner* v. *Sunnen, supra*, that the unappealed decision of the Board requires that collateral estoppel controls the issue of deductibility of the guaranteed dividends but that this Court is free to decide the issue of deductibility of the premium because that issue was not before either the Board of Tax Appeals or the Fourth Circuit Court of Appeals in the prior proceeding. We agree with respondent.

As far as the so-called excess dividends are concerned, it is clear beyond peradventure that this issue was considered and decided adversely to the petitioner by the Board of Tax Appeals. That the Board's treatment of the issue was cursory, in our opinion, in no way detracts from this relevant and critical fact. The decision of the Board cannot be circumvented, as the petitioner would have us do, by the application of the broadly descriptive characterization of the guaranteed stock as "debt" by the Fourth Circuit Court of Appeals; that

characterization, as well as its underlying rationale, was articulated solely in the context of the determination of another issue, namely, the deductibility of the guaranteed dividends. The deductibility of the so-called excess dividends is the same issue and pertains to the same basic facts as were involved in the prior proceeding to which both petitioner and respondent herein were parties, the only difference being the taxable years involved. But see fn. 1 *supra.* As in *Commissioner* v. *Sunnen, supra,* the situation "presents a classic situation for the application of the doctrine of collateral estoppel." See *Fairmont Aluminum Co.,* 22 T.C. 1377, 1380 (1954), affd. 222 F. 2d 622 (C.A. 4, 1955). To conclude otherwise would produce the eccentric result that petitioner would be relieved of the effect of a clearly delineated adverse decision from which petitioner, for reasons of its own, chose not to appeal. We reject petitioner's attempt to avoid the application of collateral estoppel by arguing that there has been a change in climate because the prior case involved the year 1929, was concluded in 1936 in the middle of the depression, and economic and business changes since 1936 have brought about "new methods of financing." Not only do petitioner's assertions constitute mere generalizations inadequately supported by the record herein, but we consider them insufficient in any event.

With respect to the premium, we are satisfied that the principle of collateral estoppel has no application. We have already indicated our view that the characterization of the guaranteed stock as "debt" by the Fourth Circuit in the prior proceeding was made in the context of the particular issue before it and that consequently petitioner's assertion that such characterization should be controlling for all purposes is unacceptable. Just as the Fourth Circuit did not consider the so-called excess dividend issue, so neither that court nor the Board of Tax Appeals had any occasion to consider the question of a premium. Cf. *Susanna Bixby Bryant,* 2 T.C. 789 (1943). The common issue in both prior proceedings dealt with payments of the guaranteed dividends, i.e., payments keyed to the par value of the guaranteed stock. By way of contrast, the payments in question herein are not so keyed and it is this distinction which makes inapplicable *Bankers Mortgage Co.* v. *United States,* 423 F. 2d 73 (C.A. 5, 1970), wherein it was held that a prior determination that "proceeds" of a "loan" were in fact taxable gain precluded a taxpayer from contending that certain subsequent payments should be considered "interest" on the alleged loan.

What we have here is a separable legal issue in a separable context from that involved in the prior proceeding. Under such circumstances, the prior characterization of the guaranteed stock as "debt" does not justify the application of collateral estoppel. *Commissioner* v. *Sunnen,* 333 U.S. at 601; *Consolidated Edison Co. of New York* v. *United*

*States*, 279 F. 2d 152, 154 (C.A. 2, 1960), affirmed on other grounds 366 U.S. 380 (1961) ; *The Evergreens* v. *Nunan*, 141 F. 2d 927 (C.A. 2, 1944) ; *Buder* v. *United States*, 332 F. Supp. 345, 348 (E.D. Mo. 1971) ; *Fairmont Aluminum Co.*, 22 T.C. at 1381.

Since our analysis indicates that the issues involved herein are not identical with those involved in the prior proceeding before the Fourth Circuit Court of Appeals—the circuit to which an appeal herein would lie—we have no reason to consider the application of *Jack E. Golsen*, 54 T.C. 742 (1970), affirmed on other grounds 445 F. 2d 985 (C.A. 10, 1971). We now turn to a substantive consideration of the deductibility of the premium.

Petitioner posits its claim for a deduction on section 1.61–12(c), Income Tax Regs. (section 1.163–3(c) of the present regulations— see fn. 3 *supra*), which provides, in pertinent part:

(1) If bonds are issued by a corporation at their face value, the corporation realizes no gain or loss. If the corporation purchases any of such bonds at a price in excess of the issuing price or face value, the excess of the purchase price over the issuing price or face value is a deductible expense for the taxable year. * * *

Again relying on the proposition that the instruments involved herein were characterized by the Fourth Circuit as "nothing more than a secured debt" (90 F. 2d at 975), petitioner argues that respondent's regulations require the allowance of a deduction for the entire amount of the excess of the redemption price over the par value of the guaranteed stock. Respondent counters with the assertion that, in acquiring its guaranteed stock, such excess was paid in consideration of the holders' right to participate in management and in earnings and that, as a consequence, such expenditure, together with the amount paid which was equal to the par value of the guaranteed stock, constituted a nondeductible distribution of money in redemption of petitioner's capital stock within the purview of sections 302, 316, and 317.

Here again, we agree with respondent. Initially, we note that we have no reason to determine the characterization of the amounts distributed against the par value of such stock, since neither party claims any tax consequences, at least insofar as this proceeding is concerned, as to such amounts. We are concerned only with the excess. Just as we have concluded that the Fourth Circuit's broad characterization of the guaranteed stock as "debt" does not control for all purposes, so do we conclude with respect to respondent's regulations. The security rights of the holders in the first-mortgage lien on petitioner's property were limited to the principal of the guaranteed stock and the guaranteed dividends. These rights did not extend to the so-called excess dividends. Moreover, we consider it significant that only a "default in the punctual payment" of the *guaranteed dividends* would cause the

principal amount of petitioner's obligations to become immediately payable. See 33 B.T.A. at 896. No such eventuality obtained in the event of any failure to pay matching dividends. Finally, we find it difficult, if not impossible, to conceive that the substantial premium which petitioner paid (some 3½ to 6 times the par value) could possibly be attributable in its totality to a premium of a 6-percent or 7-percent interest-bearing obligation. Perhaps a portion of this premium might be so attributable, but the record herein contains no foundation for making an allocation, the parties having presented their positions on an all-or-nothing basis.[4]

We recognize that, in the case of convertible bonds, some courts have applied respondent's regulations literally. Thus, in *Roberts & Porter, Inc.* v. *Commissioner*, 307 F. 2d 745 (C.A. 7, 1962), reversing 37 T.C. 23 (1961), the Seventh Circuit held that the "plain and ordinary meaning of Regulation 1.61–12(c)(1)" made it applicable to convertible bonds. The court went on to note that "There is no provision in the Code or the Regulations which requires allocation of a part of the total purchase price to the value of the conversion privilege." 307 F. 2d at 747. The Seventh Circuit's decision has been followed by the Tenth and Fourth Circuit Courts of Appeals. See *Southwest Grease & Oil Co.* v. *United States*, 435 F. 2d 675 (C.A. 10, 1971), affirming per curiam 308 F. Supp. 107 (D. Kan. 1969); *Head Ski Co.* v. *United States*, 454 F. 2d 732 (C.A. 4, 1972), affirming per curiam 323 F. Supp. 1383 (D. Md. 1971). See also *Universal Tractor-Equipment Corp.* v. *United States*, an unreported case (E.D. Va. 1967, 19 A.F.T.R. 2d 1337, 67–1 U.S.T.C. par. 9409).

*Roberts & Porter* and *Head Ski* are not, however, controlling herein. Petitioner's "guaranteed stock" is distinguishable from convertible bonds or other convertible debt instruments in that it gave the holders a *present right* to share in the earnings of the petitioner. Convertible bondholders, on the other hand, acquire such rights only *after* they have exercised the conversion privilege attaching to the bond. Moreover, in the case of a convertible bond, the holder is not, and cannot be, a creditor *and* stockholder at one and the same time by virtue of the same instrument. See *AMF Incorporated* v. *United States*, 476 F. 2d 1351, 1353 (Ct. Cl. 1973); *Chock Full O' Nuts Corporation* v. *United States*, 453 F. 2d 300, 304 (C.A. 2, 1971); *Hunt Foods & Industries, Inc.*, 57 T.C. 633, 642 (1972), on appeal (C.A. 9, July 5, 1972).

[4] We also note the fact that the guaranteed stock issued at the time of the 4-for-1 exchange in 1949 provided that under certain circumstances the holders of that stock would share pari passu with the holders of the common stock in petitioner's surplus assets. See fn. 1 *supra*. But respondent makes no point of this stockholder characteristic. That element, together with the uncertain state of the record and the stipulation of the parties that the "basic facts" herein "are found" in the reports of the prior proceedings and are applicable herein, have caused us to disregard any consideration of the impact of the above-mentioned provision—a provision apparently not applicable to the previous issues of the guaranteed stock. Compare 33 B.T.A. at 898.

By way of contrast, a holder of petitioner's guaranteed stock occupied a dual status, i.e., the right to be paid the principal of petitioner's obligation and the guaranteed dividend *and* the right to receive matching dividends.

Finally, the rationale of *Hunt Foods & Industries, Inc., supra,* is consistent with our conclusion herein. That case dealt with the amortization of a claimed allocable discount over the life of the subject debentures. See 57 T.C. at 641. We placed great emphasis there on the fact that, in the amendment to section 1232 by the Tax Reform Act of 1969 dealing with evidences of indebtedness issued at a discount, Congress "did not provide for the allocation of the amount received for a convertible debenture between the debt and conversion privilege." See 57 T.C. at 639. We also concluded that it would be inappropriate to draw any inference from the addition of section 249 by that Act, which reversed in futuro the result reached in *Roberts & Porter* and *Head Ski,* that Congress intended to sanction a loophole in other situations not explicitly covered by the new legislation. See 57 T.C. at 641. Finally, we note that *Hunt Foods* also involved future rights rather than present rights to an equity interest.

The key to the instant case lies in the fact that the additional right of a holder of the petitioner's guaranteed stock to share pari passu in respect of dividends on the common stock was a *fixed present right* to an equity interest rather than an *optional future right* to such an interest. That distinguishing feature, coupled with the difference in case of default between nonpayment of guaranteed dividends and of matching dividends, makes the prior authorities inapposite.

Reviewed by the Court.

> *The parties are directed to move with respect to further proceedings in this case, or otherwise act, on or before June 3, 1974.*

WITHEY, *J.,* dissenting: Because I am unable to discern any equity interest in petitioner which is conveyed to the holders of the guaranteed "stock" in controversy by the issuance of such "stock," I am compelled to conclude that the "stock" represents no more than evidence of debt. This being true, it follows that the premiums paid for its repurchase are deductible under the regulations cited in the majority opinion.

GOFFE, *J.,* agrees with this dissent.

DRENNEN, *J.,* dissenting: I respectfully disagree with the majority on the second issue.

Since the evidence does not disclose whether the premium was paid for the equity features attached to the guaranteed stock or for the debt features, I think we are left with the reality that petitioner paid what the market required to redeem the guaranteed stock itself. If I understand the findings of fact correctly the petitioner paid on the average $12 to $14 more than the average market price of the stock during the year in which the purchases were made. Of course the average market price of the stock included most of the excess of the price paid over the par value of the stock and since petitioner could not expect to buy the stock for less than the market price, it cannot realistically be said that petitioner was paying that part of the premium for anything other than to meet the market price, which was set by third parties. So I am left with the impression that petitioner paid a premium to buy the stock itself, just as any trader or investor would have to meet the market price to acquire any stock or bond.

If this is so we must then determine only whether the stock represented debt or equity. Both this Court in 33 B.T.A. 895 and the Court of Appeals for the Fourth Circuit in 90 F. 2d 971 characterized this stock as a secured debt of the petitioner. The Court of Appeals went further than this Court, saying:

Nor does the fact that the guaranteed stock shares in the profits of the corporation above the guaranteed dividends, if these are exceeded by the ordinary stock dividends, and that it has a vote in the management of the corporation, detract from its position as secured indebtedness. * * *

I would accept this characterization of the stock for purposes of this case, i.e., that the stock is an evidence of indebtedness. This being so, the premium paid is clearly deductible in the taxable year paid under section 1.61–12(c), Income Tax Regs., quoted in the majority opinion.

In addition, with reference to convertible bonds, it was held in *Roberts & Porter, Inc.* v. *Commissioner*, 307 F. 2d 745, that "There is no provision in the Code or the Regulations which requires allocation of a part of the total purchase price to the value of the conversion privilege." The Fourth Circuit, which is the controlling circuit in this case, see *Jack E. Golsen*, 54 T.C. 742, is in accord. See *Head Ski Co.* v. *United States*, 454 F. 2d 732 (C.A. 4, 1972). I do not find it as easy as does the majority to distinguish this guaranteed stock from convertible bonds.

In fact, a great deal of the majority opinion is devoted to distinguishing other cases which might suggest a different result in this case; but I find no case cited which supports the conclusion reached by the majority. I would not struggle so hard to avoid what appears to be a tax windfall to petitioner. I would allow the deduction which I think petitioner is entitled to under the law, the regulations, and the decided cases.

GOFFE, *J.*, agrees with this dissent.

WILES, *J.*, dissenting: I respectfully disagree with the majority opinion on the second issue. Although I agree with the majority that collateral estoppel does not preclude relitigation of whether the securities are debt or equity, I do not believe that our reconsideration of this issue should ignore the prior opinions rendered by the Board of Tax Appeals and the Fourth Circuit. The Board of Tax Appeals weighed all the facts in evidence in order to determine the character of the securities in question. It concluded as follows:

> Though there are facts pointing to either interpretation [debt or stock], on a full study of the case we are convinced that the second characterization [as a debt] more aptly fits the situation and that the owner of the guaranteed stock should be classed as a creditor of the petitioner. True, he had the right to vote and was entitled to a share in the petitioner's net earnings after the payment of its current liabilities, including the so-called "dividends", but the primary consideration appears to have been the specified and certain income to the owner, coupled with an assured recovery of the principal by resort to the property if a default in the interest payment should occur. [33 B.T.A. at 899.]

In affirming the opinion of the Board, the Fourth Circuit stated:

> Nor does the fact that the guaranteed stock shares in the profits of the corporation above the guaranteed dividends, if these are exceeded by the ordinary stock dividends, and that it has a vote in the management of the corporation, detract from its position as secured indebtedness. These incidents of stock ownership were doubtless added to the ordinary rights of a secured creditor for the purpose of making the loan attractive; but a bond does not cease to be a bond merely because a share of stock is issued with it, and if the law, as did the law of Virginia, permits some rights of a stockholder to be included in an instrument evidencing a secured debt, the rights of the creditor are not impaired by so including them.
>
> This guaranteed stock, then, while sui generis, is, in the light of all its attributes, nothing more than a secured debt which is not to be repaid so long as the interest payments thereon are met when due, and which entitles the lender, in addition to interest, to participate with the stockholders in the earnings and management of the business. And the guaranteed dividends paid on such stock differ in no particular from interest paid on a secured debt, and should be treated as such as a matter of corporate financing and for income tax purposes. [90 F. 2d at 974–975.]

Thus, the Board and the Fourth Circuit, taking into consideration all of the attributes of the securities and the intent of the parties at the time of issuance, determined that the securities possessed more characteristics of a debt than of a stock and therefore should be treated as debt securities. The securities in question are the same as those examined by the Board and the Fourth Circuit. Furthermore, no new facts have been presented which would lead us to question the validity of the prior determinations made by those tribunals. I, therefore, would hesitate to declare that the characteristics which those tribunals found to preponderate debt securities have somehow in the interim been transformed into characteristics which indicate that they represent stock securities. The majority opinion in effect re-

verses the factual determinations made by the Board. The presentation of a new issue regarding these securities does not change their basic characteristics. We should accept the thorough examination of the attributes and history of these securities made by the Board and the Fourth Circuit. The price paid for the securities was undoubtedly affected by the presence of the "stock-type" attributes of the securities; however, that fact does not change the basic nature of the securities.

Having determined that the securities should be classified as debt securities, it follows that the premium paid on redemption would be deductible under section 1.61–12(c), Income Tax Regs.

GOFFE, J., agrees with this dissent.